**John MOORE, Plaintiff and Appellant,**

v.

**UTAH TECHNICAL COLLEGE, Defendant and Respondent.**

**No. 19546.**

Supreme Court of Utah.

Oct. 21, 1986.

---

Darrell G. Renstrom, Ogden, for plaintiff and appellant.

David L. Wilkinson, Atty. Gen., Salt Lake City, Robert L. Gardner, Cedar City, for defendant and respondent.

HALL, Chief Justice:

John Moore initiated this action against Utah Technical College at Provo ("Utah Tech") for allegedly failing to comply with proper termination procedures in violation of Moore's constitutional and contractual rights. Moore appeals a summary judgment of dismissal. We affirm.

I

In July 1977, Moore was hired by Utah Tech as a probationary instructor for one year.[1] When Moore commenced his employment, the following tenure and retention policy ("1977 policy") was in effect and part of the school's policy and procedure manual:

2.4.0 *Tenure*

. . . .

All newly appointed probationary staff members must be aware and understand the following:

---

1. Although Moore's original "contract" is not part of the record, Utah Tech admits in its answer that Moore was hired in 1977 under a one-year "probationary contract." Each of the annual contracts between the parties were memorialized in a "Notice of Appointment" issued to Moore. Each notice issued was subsequently signed and returned to Utah Tech by Moore. Utah Tech asserts that the 1977 Notice of Appointment was similar to those of other years, which are contained in the record, and Moore does not dispute this assertion.

1. The precise terms and conditions of every appointment will be stated in writing and be in the possession of both institution and staff member before the appointment is consummated.

2. If the staff member is not to be continued in service, notice shall be given three months prior to the expiration date of his/her current appointment period, *and the staff member shall be accorded due process.*

(Emphasis added.)

In May 1978, Utah Tech issued Moore a notice of appointment for the 1978–79 school year. Moore signed the notice the following day and returned the same to Utah Tech.

On January 24, 1979, Utah Tech's president approved changes to Utah Tech's tenure and retention policy contained in the school's policy and procedure manual. These changes were approved by Utah Tech's institutional council on February 7, 1979, to become effective February 16, 1979. The new policy ("1979 policy") provided in pertinent part:

2.15.0 *Tenure*

. . . .

Tenure is that provision of employment attained by a full-time, professional staff member after completion of a three-year probationary period during which the staff member's performance is found to be such as to make him/her an asset to the institution.... [T]he President of the institution shall have authority to extend the probationary period an additional year. The probationary period shall not be extended for more than two additional years. The staff member shall be so notified in writing.

. . . .

All probationary staff members must be aware and understand the following:

1. The precise terms and conditions of every appointment will be stated in writing (letter of appointment, Policy & Procedures Manual, etc.), and be in the possession of both institution and staff member before the appointment is consummated.

2. If service is not to be continued, notice shall be given three months prior to the expiration date of his/her current appointment period.

In May 1979 and May 1980, Moore accepted one-year probationary appointments with Utah Tech for the 1979–80 and 1980–81 school years. The 1980–81 Notice of Appointment provided that Moore's employment would be continued throughout the term of the appointment "unless released by the President in accordance with institutional regulations, policies and procedures."[2] This notice was also stamped: "For your information, this letter of appointment is for your *fourth* probationary year toward gaining tenured status." (Emphasis in original.)

In 1980, the Board of Regents instructed the president of Utah Tech to re-evaluate the college's tenure program and conform it to the Regent's policies on that subject. Consequently, on February 20, 1981, Utah Tech's Institutional Council revised its tenure and retention policy including its policy concerning nonretention of nontenured instructors. The following is the pertinent portion of the adopted policy ("1981 policy"):

2.14.9.8 *Termination of Nontenured Faculty*

This policy does not require proceedings to terminate the employment of a nontenured faculty member at the end of his/her contract period by nonrenewal of his/her appointment, except as hereinafter specified.

... *Nevertheless, if a nontenured faculty member alleges that the nonrenewal of his/her contract is based on discriminatory or prejudicial treatment in violation of his/her constitutional rights, he/she shall be accorded the procedural due process provided in this policy.* Upon written notice to the President of such an allegation and request for a hearing, the faculty member shall have the burden of introducing valid evi-

**2.** Moore's other notices of appointment contained a similar provision.

dence sufficient to support a decision that the nonrenewal was based on discriminatory, prejudicial facts and reasons. Review on appeal shall be limited to a determination of whether the President has met the nonprejudicial, nondiscriminatory requirement.

A. *Advance Notice of Termination.*
When the administration wishes to discontinue a nontenured faculty member's appointment ... advance notice will be given in writing by the President as follows: (1) for faculty who have served for more than one academic year, notice will be given not later than December 15 if the appointment expires at the end of that academic year....

(Emphasis added.)

On March 5, 1981, Moore was given a three-month notice of nonrenewal effective June 5, 1981 (the last day of Moore's employment for the academic year). The 1981 policy was transmitted to the Board of Regents who "approved" the same on March 10, 1981. The denial of Moore's request for a hearing under either the 1977 or 1981 policy led to this litigation. Utah Tech does not claim Moore was given the notice for "cause" or was otherwise discharged.

On appeal, Moore claims that the central issue is whether or not he was entitled to a hearing prior to the nonrenewal of his employment contract. The right to such a hearing may be granted by the state or federal constitutions, by statute, by administrative rule, or provided for by contract. Moore believes that because the school decided not to provide such a hearing, he is still a Utah Tech employee; Moore's complaint prays for reinstatement with back salary and he implicitly claims he has a contractual employment right until such

time as Utah Tech properly terminates him, or does not rehire him, as the case may be, in accordance with the terms of his contract.

## II

 Under the due process clause found in the fourteenth amendment of the United States Constitution, the prerequisites to claiming a right to a *pretermination* evidentiary hearing are: (1) state action; and (2) a constitutionally protected liberty or property interest.[3] A nontenured instructor whose employment contract is based upon a one-year appointment does not have a constitutionally recognizable property right to be reappointed.[4] Therefore, a hearing prior to the non-renewal of such a contract is constitutionally required only when the decision not to rehire the nontenured instructor deprives him or her of a liberty interest protected by the fourteenth amendment.[5] In *Board of Regents v Roth,*[6] the United States Supreme Court held that the decision not to rehire a nontenured instructor would not deprive him or her of a liberty interest unless it was in retaliation for the teacher's exercise of his or her constitutional rights.[7]

 Moore concedes that at the time he received his nonrenewal notice, he was not a tenured instructor at Utah Tech. Moreover, Utah Tech did not discharge Moore for "cause." It simply decided not to rehire him after the 1980–81 school year. Finally, Moore did not allege in his complaint that the decision not to renew his contract was made in retaliation for the exercise of his constitutional rights. In accordance with the principles set forth above, Moore had no constitutional right to a hearing prior to the non-renewal of his contract.

3. *E.g., Gray v. Department of Employment Sec.,* 681 P.2d 807, 816 (Utah 1984).

4. *Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

5. *Roth,* 408 U.S. at 572–75, 92 S.Ct. at 2706–08. *See also Perry v. Sindermann,* 408 U.S. 593,

597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972).

6. 408 U.S. 564, 92 S.Ct. 2701.

7. 408 U.S. at 578, 92 S.Ct. at 2709.

## III

Moore claims that Utah Tech's policy and procedure manual conferred upon him a right to a hearing prior to the nonrenewal of his contract. He relies upon two theories to support his claim of a contractual right to a hearing.

## A

In his first argument Moore claims that the 1977 policy, which, as previously noted, provided that probationary staff members were to be accorded "due process" prior to contract nonrenewal, was "instituted" and "adopted" by the State Board of Regents. He then points out that the 1979 policy, which deleted the reference to "due process," was never submitted to the Board of Regents for approval after being adopted by Utah Tech's president and its institutional council. The contention is that because the 1979 policy was not approved by the Board of Regents, it was of no effect; in Moore's words, "what the Board of Regents gives, cannot be taken away by an institutional council except by approval; and in this case, it is conceded by the defendant/respondent the approval was never obtained by the school." Thus, Moore would have this Court conclude that his termination had to be in compliance with the 1977 policy. In this regard, Moore contends that the "due process" guaranteed under the 1977 policy at a minimum grants him a right to a hearing prior to the nonrenewal of his contract. The problem with this argument is that the record is devoid of evidence to support his claim that the State Board of Regents "instituted" or "adopted" the 1977 policy. Indeed, it appears that no such evidence exists.

Since 1919, the State Board of Education has been also designated the State Board for Vocational Education.[8] In 1947, the legislature clarified the powers of the State Board of Education with respect to Utah Tech.[9] Of particular concern is the scope of these powers from December 1973 through the year 1977. During this period, section 53–16–14 (Repl.Vol. 5B, 1970 ed.) (amended 1978), provided in pertinent part:

Utah Technical College at Provo ... shall be under the management, control and supervision of the state board for vocational education, which board shall prescribe the courses of study ...; employ the necessary ... instructors ...; prescribe their qualifications and duties and determine their salaries.... The board shall have charge of the general interests of the institutions and shall have power to enact bylaws and regulations for all of the affairs of the institutions, not inconsistent with the laws of the state.[10]

In 1969, the legislature enacted the Higher Education Act of 1969.[11] This Act vested the governing powers over the system of higher education in one body, the State Board of Higher Education, today known as the State Board of Regents.[12] Except as was otherwise provided by the legislature, the State Board of Regents succeeded to the powers, duties, authorities, and responsibilities that had previously been held and exercised by the governing boards of the schools over which the Board of Regents was given jurisdiction.[13] Since Utah Tech was made part of the state's system

8. Act of March 13, 1919, ch. 86, § 3, 1919 Utah Laws 274, 275 (codified as amended U.C.A., 1953, § 53–16–2 (Repl.Vol. 5B, 1981 ed., Supp. 1986)). This designation was necessary before the state could receive federal aid for vocational education. Act of February 23, 1917, ch. 114, § 5, 39 Stat. 929, 931–32.

9. Act of March 13, 1947, ch. 76, § 1, 1947 Utah Laws 348, 349 (codified as amended, U.C.A., 1953, § 53–16–14 (Repl.Vol. 5B, 1981 ed.)).

10. See also U.C.A., 1953, § 53–16–19 (Repl.Vol. 5B, 1970 ed.) (all claims against Utah Tech must

be approved by the State Board for Vocational Education and State Board of Examiners prior to payment) (repealed 1978).

11. Higher Education Act of 1969, ch. 138, § 1, 1969 Utah Laws 582.

12. U.C.A., 1953, § 53–48–2 (Repl.Vol. 5B, 1970 ed.) (amended 1975); § 53–48–4 (Repl.Vol. 5B, 1970 ed.) (amended 1978); §§ 53–48–2, –3(2), –4 (Repl.Vol. 5B, 1981 ed.).

13. U.C.A., 1953, § 53–48–4 (Repl.Vol. 5B, 1970 ed.) (amended 1978).

of higher education,[14] the legislature had to reconcile the obvious conflict between the management and control powers vested in the State Board of Regents and the State Board for Vocational Education:

> In order to facilitate proper co-ordination and direction of high school, area vocational center, and technical college vocational training programs, the Utah Technical College at Provo ... shall remain under the management and control of the state board for vocational education. With respect to the Utah Technical College at Provo ... the State Board of Higher Education [State Board of Regents] shall have jurisdiction and shall exercise the powers and responsibilities specified in sections 53–48–9, 53–48–10, 53–48–12, 53–48–13, 53–48–14 and 53–48–17 .... [15]

Additionally, except in the case of Utah Tech and Utah Technical College at Salt Lake City ("technical colleges"), the Higher Education Act of 1969 also established an institutional council for each school in the state's system of higher education.[16] Section 53–48–15 (Repl.Vol. 5B, 1981 ed.) provides in pertinent part:

> Unless the [B]oard [of Regents] shall reserve to itself such action, the president of each institution with the approval of the institutional council:
>
> ....
>
> (4) May provide for the constitution and organization of the faculty and administration of each institution, and enact rules and regulations for the government of the faculty and employees of that institution, which shall include the

establishment of a prescribed system of tenure for each institution.

This was the state of the law from December 1973 through the year of 1977.

On December 20, 1973, the State Board of Regents adopted its statement of policy on academic freedom, professional responsibility, and tenure in the Utah system of higher education.[17] The Regent's policy provides in part:

> It is the policy of the Board that prior to May 1, 1974, all institutions within the Utah System of Higher Education, for which the Board is "vested with the control, management, and supervision," shall have prepared for adoption by the respective Institutional Councils a statement of Academic Freedom, Professional Responsibility and Tenure. By June 1, 1974, a copy of the adopted statement shall be filed with the Commissioner's Office. If a statement has not been submitted by this date, it will be assumed that this document supersedes existing and proposed institutional statements. Action on the Statements shall be taken by the State Board of Regents on or before the July 1974 board meeting.

(Footnote omitted.)

Although the policy does not, by its terms, "impose a uniform code upon all institutions" covered by the policy, all schools under the Board of Regent's control at the time the policy became effective, submitted plans containing many uniform aspects: i.e., the use of seven-year probationary periods, rigorous review procedures emphasizing standards of quality, and counseling early in the review procedure of

**14.** U.C.A., 1953, § 53–48–3 (Repl.Vol. 5B, 1981 ed.).

**15.** U.C.A., 1953, § 53–48–4 (Repl.Vol. 5B, 1970 ed.) (amended 1978).

**16.** U.C.A., 1953, § 53–48–19(1) (Repl.Vol. 5B, 1970 ed.) (amended 1978). *See also* U.C.A., 1953, § 53–48–19(2) (Repl.Vol. 5B, 1970 ed.) (general powers) (amended 1978).

**17.** Academic Freedom, Professional Responsibility, and Tenure in the Utah System of Higher Education; Statement of Policy (adopted Dec. 20, 1973) (published by the Office of the Commissioner of Higher Education 1974) [hereinaf-

ter cited as 1973 policy]. The State Board of Regents is an administrative agency. *See Petty v. Utah State Board of Regents,* 595 P.2d 1299, 1302 (Utah 1979). We may take judicial notice of administrative rules and regulations as well as published accounts of administrative proceedings and actions. *See* Utah R.Evid. 201(a), (b), (c), (f) (Repl.Vol. 9B, 1977 ed., Supp. 1986). *See also Salt Lake County v. Tax Comm'n,* 532 P.2d 680, 681 (Utah 1975) (to the extent that *Carter v. Industrial Comm'n,* 76 Utah 520, 290 P. 776 (1930), is inconsistent with this rule, it is overruled).

nontenured faculty.[18] In short, the plans submitted by the schools paralleled the Board's policy in many respects. Thus, under the terms of section 53–48–15(4) quoted above, the Board of Regents reserved to itself final approval of tenure and retention policy at the institutions over which it was vested with managerial powers.

The State Board for Vocational Education, at some point prior to 1977, also established its policy regarding tenure and instructor retention for the technical colleges. Although we have been unable to locate a copy of this policy, we do know it permitted tenure to be awarded after a three-year probationary period and did not require five-year plans limiting tenure.[19] Aside from the presumed validity of Utah Tech's policies,[20] the technical colleges operated in compliance with the Board for Vocational Education's tenure policy.[21]

■ It clearly appears that Utah Tech's 1977 policy concerning the termination or nonrenewal of nontenured instructors was not instituted and adopted by the State Board of Regents as claimed by Moore. The policy was put into effect by the State Board for Vocational Education, the body vested with control over the technical colleges in 1977 and prior thereto.

In 1978, the state legislature transferred governance of the technical colleges from the State Board for Vocational Education.[22] This Act, among other things, placed the technical colleges under the management, control, and supervision of the State Board of Regents, and established an institutional council for the two schools.[23]

■ Although the Board of Regent's policy statement on academic freedom, professional responsibility, and tenure in the Utah system of higher education proclaims to cover all higher education institutions over which the Board is vested with control, management, and supervision, the document did not immediately control the tenure and retention policies ·at Utah Tech. The policy clearly was not contemplated as covering the technical colleges. This conclusion is necessitated for several reasons. First, the Board of Regent's legal foundation for imposing the policy upon the schools in 1974 was based upon section 15 of the Higher Education Act of 1969 as it existed in 1973 when the policy was adopted; as indicated above, the Board of Regents was not vested with management and control of Utah Tech in 1973.[24] Second, the policy itself states that the technical colleges are under the management and control of the State Board for Vocational Education; implicit in this statement is the fact that the document was not meant to cover the technical colleges. Third, the policy by its own terms was self-executing on June 1, 1974, as to those institutions not submitting written five-year plans limiting tenure to the Board of Regents. As previously indicated, all schools within the Board of Regent's control in 1974 submitted plans which were uniform in many respects. The technical colleges neither submitted plans nor were covered by the self-execution clause in the 1973 policy. Finally, the Board's actions, which are set

---

**18.** State Board of Regent's Minutes from the July 15, 1980 Board Meeting, at 41 (approved September 12, 1980).

**19.** Commissioner's Summary Report of Institutional Concurrence with Five-year Tenure Plans in the Utah System of Higher Education (1974–1979), presented at the July 15, 1980 regent's board meeting, State Board of Regent's minutes from the July 15 1980 board meeting, p. 41–43 (approved September 12, 1980).

**20.** *Cf. Petty,* 595 P.2d at 1302 (actions of Board of Regents presumed lawful and within authority unless contrary shown).

**21.** *See supra,* note 19.

**22.** Act of January 28, 1978, ch. 25, 1978 Utah Laws 85 (effective July 1, 1978).

**23.** Act of January 28, 1978, ch. 25, § 1–3, 1978 Utah Laws 85, 86–89 (effective July 1, 1978) (codified as amended, U.C.A., 1953, §§ 53–16–14, 53–48–4, –19) (Repl.Vol. 5B, 1981 ed., Supp. 1986).

**24.** *See* 1973 Policy, *supra,* note 17, at 1 n. 1.

forth below, indicate that the Board itself did not believe that its policy statement was applicable to the technical colleges without some further action on its part. Accordingly, after July 1, 1978, that portion of Utah Tech's tenure and retention policy controlling the process by which Moore's contract could properly not be renewed, was governed by U.C.A., 1953, § 53–48–15(4) (Repl.Vol.1981 ed.). As indicated above [25] that section provides that absent action by the Board of Regents, an institution's president with the approval of its institutional council has the power to manage its instructors, as well as the power to establish the prescribed system of tenure and retention. As previously indicated, Utah Tech's president approved that school's 1979 policy on January 24, 1979. The policy was further approved by Utah Tech's Institutional Council on February 7, 1979, to become effective February 16, 1979. Since this adoption was in conformity with the cited statute, it was within Utah Tech's powers and thus the policy was in full force and effect on February 16, 1979.[26]

At the Board of Regent's meeting on July 15, 1980, the regents discussed the recommendation of the Commissioner of Higher Education that:

1. Utah Technical College at Salt Lake and Utah Technical College at Provo conform with the policy adopted by the State Board of Regents on December 20, 1973. . . .

Following their discussion, the Board unanimously adopted the recommendation and placed a six-month deadline for compliance with its 1973 policy by the technical colleges.[27] Thus, on January 15, 1981, Utah Tech had to operate in compliance with the Board of Regent's tenure and retention policy. It follows that Utah Tech's 1979 policy was in force and effect until January 15, 1981. Since the 1979 policy was valid and in effect when the 1980–81 contract between the parties came into existence, the 1979 policy as opposed to the 1977 policy governed nonrenewal of Moore's contract.[28] The 1979 policy did not provide for "due process." Therefore, Moore's first argument is without merit.

B

Moore's second argument is based upon the proposition that he should have been terminated in conformity with the 1981 policy, which as previously indicated, provides for a hearing prior to the nonrenewal of a probationary employees' contract in some situations. With regard to those rights, the 1981 Utah Tech policy is substantially similar to the 1973 policy established by the Board of Regents. Accordingly, whether Moore's alleged rights spring from the regent's policy applicable to Utah Tech on January 15, 1981, or Utah Tech's 1981 policy effective on February 20, 1981, is of no consequence to this appeal.[29]

There is little dispute that an educational institution's policies and procedures can implicitly be incorporated into an instructor's contract.[30] In this case, our review of Moore's notices of appointment, as well as the 1977, 1979, and 1981 policies, convince

---

**25.** *See supra* p. 638.

**26.** Moore's alternative reliance upon U.C.A., 1953, § 53–48–13 (Repl.Vol. 5B, 1981 ed.) is misplaced inasmuch as that section only deals with approval of curriculum changes and does not in any respect concern policies regarding personnel.

**27.** State Board of Regent's minutes from the July 15, 1980 board meeting, at 43 (approved September 12, 1980).

**28.** *See infra* p. 641–643.

**29.** For purposes of this opinion, we will assume that the 1981 policy went into effect upon approval by Utah Tech's institutional council and prior to the Board of Regent's approval of the policy.

**30.** *Accord United Calif. Bank v. Prudential Ins. Co.,* 140 Ariz. 238, 258, 681 P.2d 390, 410 (Ariz. Ct.App.1983). *Compare Lancaster v. Arizona Board of Regents,* 143 Ariz. 451, 459, 694 P.2d 281, 289 (Ariz.Ct.App.1984), *with Boyce v. Umpaua Community College,* 67 Or.App. 629, 680 P.2d 671, 675 (1984).

us that the policies were intended to be incorporated into Moore's contracts. Each of Moore's notices of appointment expressly incorporated the school's "policies" with regard to termination procedures.[31] And each notice of appointment was made "subject to the laws and regulations governing Utah Technical College at Provo." Furthermore, language in section 2.15.0.1 of the 1979 policy and a substantially similar provision in section 1.4.0.1 of the 1977 policy, as well as the general tenor of each policy, indicates the policies were intended to form a basis of the bargain.

Although contracts usually incorporate documents as they exist on the day the contract is formed, which in the case of Moore's 1980–81 contract would be the 1979 policy, Moore claims he is entitled to the benefit of the 1981 policy change. In support of his argument, he relies upon dicta from *Piacitelli v. Southern Utah State College:*[32] "Thus, it has been held that an employer's policy manual may give rise to employee contractual rights even where it 'can be unilaterally amended by the employer without notice to the employee....'" Moore believes that if procedures and policies may be unilaterally changed by an employer which have the effect of deleting rights of an employee, as inferred in *Piacitelli*, then the opposite should also be true. Since Utah Tech's policy went into effect on February 16, 1981, and Moore was given notice of nonrenewal on March 5, 1981, he claims he is entitled to a hearing prior to the nonrenewal of his employment contract under the terms of the 1981 policy.

Moore's argument fails for the following reasons. First, although we begin with the presumption that the 1980–81 contract incorporated the policy and procedure manual as it existed when the contract was formed, in deciding whether a particular institutional policy is applicable to a given employee's contract, it is necessary to focus upon the intent of the parties to the contract. As inferred in *Piacitelli*, an em-

ployee's contractual rights can be unilaterally modified when those rights arise out of the employer's policy and procedure manual incorporated into the employee's contract, but whether such a modification to the contract actually occurs turns upon whether such contractual changes were intended. Thus, we must decide whether Utah Tech and the State Board of Regents intended the 1981 policy change to apply to contracts entered into prior to 1981. After reviewing the 1979 policy and the 1981 policy, we conclude that the 1981 policy was not intended to so apply. We reach this conclusion because of language in the 1981 policy which would have required Utah Tech to have given Moore notice of nonrenewal no later than December 15, 1980. It is totally unreasonable to assume that the Board of Regents or Utah Tech intended that adoption and approval of the 1981 policy would preclude Utah Tech from not rehiring probationary instructors hired for the 1980–81 school year. The weakness of the construction that Moore would have us put on the parties' agreement is borne out by the facts of this case. Utah Tech had the authority to award tenure to an instructor upon completion of his third year of employment with the institution under the 1979 policy. Moore completed his third year at the end of Utah Tech's 1979–80 school year. The school did not award Moore tenure. Nevertheless, Utah Tech's president used his discretionary power to extend Moore's probation for another year so Moore could establish he was "an asset to the institution." Moore's construction would have us hold that the school, and the Board, enacted a policy requiring it to extend Moore another year of employment, notwithstanding the fact that the school decided he was not the type of instructor desired by the school.

Furthermore, two affidavits attached to Utah Tech's motion for summary judgment support our decision. Utah Tech's personnel director, Lana Anderson, testified in one affidavit that the 1979 policy was the

---

**31.** *See supra,* note 2 and accompanying text.

**32.** 636 P.2d 1063, 1066 n. 5 (Utah 1981).

"only one dealing with the subject matter in February and March of 1981." In the other affidavit, Utah Tech's president, Wilson Sorensen, testified that the 1981 policy was not intended to have effect until the 1981–82 academic year. Moore submitted no evidence to counter these affidavits.

Finally, the State Board of Regents sought the technical colleges' compliance with the Board's retention policy in order to limit the number of tenured instructors at the school, and thus to be more selective about those instructors awarded tenure. By following Moore's construction, in this case, that overriding policy consideration could be thwarted to some extent.[33]

We conclude that the nonrenewal of Moore's contract in 1981 by Utah Tech had to be in compliance with that institution's 1979 policy concerning the subject. That policy required only that notice be given three months prior to the expiration date of Moore's current appointment. Moore does not contend that such notice was not given.

The judgment is affirmed. Costs to respondent.

STEWART, HOWE, DURHAM and ZIMMERMAN, JJ., concur.

---

**33.** *E.g.*, A. Corbin, *Corbin on Contracts* § 550 (1960) ("[C]ontracts by which the public interest is affected shall be 'construed' in the manner most favorable to the public.") (footnote omitted).