DAVIS, Presiding Judge
(concurring and dissenting):
I concur with the majority opinion except to the extent that it approves the trial court’s denial of visitation, approves analogous application of inapposite law, and deals with the application of Utah Code Ann. § 78-3a-307 (1996).
In footnote number two, supra, the majority concludes that R.S. “did not properly appeal the portion of the [trial court’s] order denying him visitation,” and thus does not consider the issue. I do not agree with the majority’s assessment as to the adequacy of R.S.’s brief. In his Statement of Issues, R.S. clearly and unequivocally appealed the trial court’s ruling denying R.S. visitation with J.M. Although the focus of R.S.’s argument in the body of his brief is on custody, those arguments apply equally to visitation. Accordingly, it is proper that we address the issue. Cf Rosendahl v. Rosendahl, 876 P.2d 870, 876 n. 1 (Utah.Ct.App.1994) (“Husband’s brief, while not in perfect compliance with Rule 24(a), is not egregious.... Thus, we determine that the inadequacies of the brief serve as their own sanction and we reach the merits of the appeal.”).
The trial court’s findings noted: (1) R.S. contacted the Office of Recovery Services (ORS) on more than one occasion after taking a blood test in September 1994 to determine his paternity but was ignored by the state agency; (2) R.S. was provided no notice of the November 1994 child abuse shelter hearing, thus preventing him the opportunity to gain custody of J.M.; (3) ORS did not serve R.S. with a paternity petition until March 1995, six months after R.S. “immediately submitted to a paternity test” when first asked to do so by ORS; (4) R.S. was not notified until March 1995 that J.M. was in foster care; (5) R.S. actively sought custody of J.M. by filing a motion with the trial court in July 1995; (6) R.S. participated in home studies to determine the appropriateness of placing J.M. in his custody; (7) as a result of these studies, the trial court implemented a visitation schedule to transition J.M. from foster care to R.S.’s home; (8) R.S.’s visitation continued with J.M. for four months until December 1995; (9) R.S. cooperated and did the very best he could for J.M. during the visitation sessions; (10) throughout the time R.S. was working with the Division of Family Services (DFS) to establish a relationship with J.M., J.M.’s mother continued to fail treatment plans, thereby creating a substantial risk of detriment to J.M. if he were returned to her custody; (11) Dr. Natalie Malovieh testified that J.M. is resilient and would likely have no long-term psychological problems if removed from his current foster placement; (12) “Craig Ramsey[,] ... Clinical Director of the Family and Attachment Center, opined that the attachment [J.M.] has to [R.S.] was that of a friend or an uncle.”
Countering these findings favorable to R.S. are numerous best interest findings depicting the strong bond between J.M. and his foster parents, the detriment J.M. would now suffer if he were removed from their custody, and the twenty-seven-month lapse between J.M.’s April 1993 birth and July 1995, when R.S. petitioned for custody of J.M. In point-of-fact, ORS should have notified R.S. that he was J.M.’s father shortly after R.S. submitted to blood testing in September 1994. Also, R.S. should have been notified of the November 1994 shelter hearing. At a minimum, had R.S. been contacted at either of these times, he would have been able to begin establishing a relationship with J.M., and the bond that now exists between J.M. and his foster parents — the exact bond which the trial court now relies upon to support J.M.’s continued placement with the foster *538 parents — -may never have developed. It is a perverse operation of the system that allows the State, acting through the offices of DFS and ORS, to keep R.S. in the dark as to J.M.’s foster placement and then use the time J.M. has been in foster care as evidence of abandonment against R.S.[1] Cf. In re M.C., 940 P.2d 1229, 1235 (Utah Ct.App. 1997) (holding “a parent is excused from maintaining contact with his or her children when the failure to maintain contact is caused by the involuntary confinement of the parent and the parent is precluded from contacting the children during such confinement”).
The majority states that “the juvenile court found that at the time of the shelter hearing R.S.’s identity was unknown, and, thus, he had no notice of the hearing.” R.S. indirectly challenges this finding, arguing because ORS initiated a paternity test for him two months before the shelter hearing, DFS should have known his identity and location. Thus, R.S. should have been notified of the shelter hearing. Even though “the DFS petition initiating the shelter hearing states that the identity and location of J.M.’s father was unknown,” given the numerous findings of the juvenile court relied upon by the majority — in effect charging R.S. with knowledge of his paternity and faulting him for failing to act — it is incomprehensible that someone participating in the shelter hearing was unaware of his identity.
Moreover, it is no less difficult to comprehend the apparent lack of communication between an office and division of the same state agency, both of which are under the “administration and general supervision of the executive director [of the Department of Human Services].” Utah Code Ann. § 62A-4a-103 (1997); accord id. § 62A-11-102 (1997). The DFS Child Welfare Manual establishes numerous procedures caseworkers must follow when removing a child from his or her parents.[2] Policy number 304 of the Child Welfare Manual outlines in detail the ongoing communication between DFS and ORS in out-of-home placement cases and places responsibility on DFS caseworkers “to make a referral to ORS for collection of parental support.” Form OH19, entitled “ORS/DFS INFORMATION SHEET,” included in the manual, “is to be completed on all [court-ordered foster care] cases and is used to make a referral to ORS.” Child Welfare Manual 304(2)(a)(5) (Jan.1995). Thus, at a minimum, DFS and ORS should have been in communication immediately following the shelter hearing in this matter. Since we must presume the juvenile court discharged its responsibility under Utah Code Ann. § 78-3a-307(l)(a) (1996),[3] the apparent lack of communication between DFS and ORS together with the failure to timely provide the juvenile court with critical information created a situation which frustrated the pur *539 pose of the statute and threatened R.S.’s parental status.
Thus, based not only on the findings of the juvenile court, but also on the facts and circumstances of this case, I would remand the ease to the juvenile court for immediate implementation of visitation.
Finally, in footnotes two and three of the majority opinion, the majority correctly observes that this is a custody case and, in varying degrees, rejects the application of parental rights termination analysis. This notwithstanding, the majority thereafter approves the analogous application of adoption law and policy to this case. While consistency may indeed be a hobgoblin, it serves well in a case such as this where broadening the ability of state agencies to obtain similar drastic results under similar circumstances is undesirable. It is enough that bona fide adoption proceedings implicate serious due process concerns without importing the same to unrelated matters. See Beltran v. Allan, 926 P.2d 892, 898-99 (Utah.Ct.App.1996) (Billings, J., dissenting), cert, denied, 936 P.2d 407 (Utah 1997). Thus, although it would not change the result insofar as the custody analysis is concerned, I believe it is inappropriate to approve the use of adoption law in a case such as this.

. My view of the shortcomings of DFS and ORS in this matter is in no way intended to denigrate the efforts of the foster parents who have welcomed J.M. into their family. Rather, J.M.'s foster parents are to be commended for the love and exceptional care they have given J.M. The foster parents, along with J.M. and R.S., are all made to endure an emotional hardship which could likely have been avoided entirely with open communication within a single governmental agency at the outset of this matter.

. DFS is an administrative agency. See State v. Wulffenstein, 571 P.2d 1319, 1322 (Utah 1977). Appellate courts may take judicial notice of administrative policies, practices, rules, and regulations. See Moore v. Utah Technical College, 727 P.2d 634, 639 (Utah 1986) (taking judicial notice of State Board of Regents’ "policy on academic freedom, professional responsibility, and tenure in the Utah system of higher education”); Salt Lake County v. Tax Comm’n, 532 P.2d 680, 681 (Utah 1975) (taking judicial notice of Utah Tax Commission’s code of administrative procedure); Johnson-Bowles Co., Inc. v. Division of Sec., 829 P.2d 101, 116 (Utah.Ct.App.1992) (taking judicial notice of Utah Department of Commerce, Division of Securities’ broker registration revocation and suspension practices).

.Utah Code Ann. § 78-3a~307(l)(a) (1996) provides:
When, at the time of the shelter hearing, the court orders that a child be removed from the custody of his parent in accordance with the requirements of Section 78-3a-306, the court shall first determine whether there is another natural parent, with whom the child was not residing at the time the events or conditions that brought him within the court's jurisdiction occurred, who desires to assume custody of the child. If that parent requests custody, the court shall place the minor with that parent unless it finds that the placement would be unsafe or otherwise detrimental to the child.
(Emphasis added.)