**STATE of Utah, in the Interest of M.S., a person under eighteen years of age,**

v.

**Margaret LOCHNER, Appellant.**

**No. 900481–CA.**

Court of Appeals of Utah.

July 23, 1991.

---

Mary Kienitz, Waine Riches (argued), Utah Legal Services, Inc., Salt Lake City, for appellant.

R. Paul Van Dam, State Atty. Gen., Carol L.C. Verdoia (argued), Asst. Attys. Gen. for appellee.

Arnold G. Gardner, Jr. (argued), Littlefield & Peterson, Salt Lake City, for guardian ad litem.

Before BILLINGS, GREENWOOD and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

Appellant Margaret Lochner appeals the termination of her parental rights in her son, M.S. On the basis of abandonment, Utah Code Ann. § 78–3a–48(1)(b) (1987), we affirm.

## FACTS

M.S. was born to appellant and Michael Salata on August 15, 1987. Although M.S.'s parents were not formally married, it appears that they lived together as husband and wife at least from the birth of M.S. until his removal from their custody on June 8, 1988.

M.S. came to the attention of the Utah Division of Family Services (DFS) shortly after his birth, because of concern that his parents could not properly care for him. This concern arose from the belief that appellant and Salata both suffer from severe chronic schizophrenia and, because they refuse to adequately treat their illnesses, are unstable in their ability to function. On at least two occasions before his last removal from the home, M.S. had been admitted into temporary shelter care.

Concern for M.S.'s well-being increased when, on June 7, 1988, it was learned that the family was being evicted from its apartment, and had not yet found a new residence. A mental health crisis worker

visited the family that day, and noted that both appellant and Salata were showing symptoms of active schizophrenia—particularly disorganized, confusing, tangential speech. Also, appellant appeared disinterested in ten-month-old M.S. and did not interact with him at all during the entire three-hour home visit.[1] In response to the crisis worker's suggestion that M.S. be placed in shelter until the couple could find another residence and stabilize their mental conditions, appellant replied, "I don't care, it's up to Mike."

The next day, the couple surrendered M.S. to DFS, and he was placed in shelter care. Roughly two weeks later, on June 21, 1988, Salata demanded that M.S. be returned to him and appellant, even though the couple had not yet found a new residence and had not obtained mental health help. At that time, a DFS worker personally escorted appellant and Salata to see a psychiatric social worker for help with their mental problems. Initially cooperative, Salata suddenly became hostile, and stormed out of the interview early, taking appellant with him. Consequently, DFS filed a petition to find M.S. dependent or neglected. Granting the petition, the juvenile court placed M.S. in the legal custody of DFS. DFS then drafted court-ordered treatment plans to rehabilitate appellant and Salata, with the goal of returning M.S. to their care.

Salata continued to refuse treatment for his mental problems, despite DFS efforts to assist him. While demanding the return of M.S., Salata continued on a course of erratic, sometimes threatening and assaultive behavior. His parental rights in M.S. were terminated on the basis of unfitness, Utah Code Ann. § 78–3a–48(1)(a) (1987), after trial in January 1990. That termination was subsequently affirmed by this court. *State*

*in Interest of M.S. v. Salata*, 806 P.2d 1216 (Utah App.1991).

Appellant's rights in M.S. were also at issue in the January 1990 trial. While evidence regarding her apparently long history of schizophrenia was received, some of that evidence was hearsay. Unlike Salata, appellant had not undergone a complete psychological evaluation for the purpose of the termination proceeding. Several mental health professionals who had evaluated appellant briefly, however, testified about her impaired mental condition. Other witnesses testified about instances of threatening and assaultive behavior by appellant. Salata testified to appellant's treatment for mental illness in several inpatient and chronic care settings since 1983, when he had met her.

While Salata had made vigorous, though improper, efforts to resume custody of M.S., evidence at trial suggested that appellant did not share Salata's zeal. Instead, from the time of M.S.'s surrender until January 1989—a period of over six months—appellant did not see M.S.[2] Additionally, the record does not indicate that appellant attempted to communicate with M.S. or to contact DFS about him during this time.

On January 30, 1989, appellant and Salata signed a DFS treatment plan expressly designed to meet the goal of returning M.S. to their custody. The written plan warned the couple that DFS could seek to terminate their parental rights if they did not comply with its terms. Under the plan, appellant and Salata were to maintain an apartment, accept mental health treatment, attend parenting classes, and have supervised visits with M.S. Appellant was largely noncompliant with this plan. She disrupted the first parenting class with an angry, threatening outburst, and left when the class leader called the police. M.S.'s

---

1. The length of the June 7 visit was explained by the fact that it was very difficult to collect even a minimal amount of information from appellant and Salata, because they were barely able to communicate intelligibly.

2. A report prepared by M.S.'s DFS caseworker indicates that two weeks after M.S. was surrendered to DFS, appellant traveled to Ohio, where

she underwent at least two psychiatric hospitalizations, followed by transfer into a chronic care facility in Michigan. Appellant's counsel objected to the admission of this portion of the report as hearsay. However, the report was admitted pursuant to Utah Code Ann. § 78–3a–35 (1987) because the caseworker testified at trial.

DFS caseworker made home visits to provide parent training, only to be confronted by appellant's resistance, which twice included ordering the caseworker from the home.

As to supervised visitation under the plan, appellant made five or six such visits with M.S. from January to March 1989.[3] On each occasion she was accompanied by Salata. During the first visit she was nothing more than a passive spectator, failing to interact with M.S. at all. She showed no signs of bonding with M.S.; in fact, the DFS caseworker noted that appellant usually refered to M.S. as "Mike's child." Although appellant did interact with M.S. during subsequent visits, the child never showed any bonding to her, as evidenced by a lack of any distress on his part when the visits ended. Salata was unable to make a scheduled visit in May 1989. The DFS caseworker contacted appellant to ask if she planned to visit M.S. at that time. Appellant's response was that the visit was Salata's idea, and that she did not intend to visit the child. Shortly thereafter, appellant left Utah.

Although served with process in the termination proceeding, appellant did not attend trial, but remained out of state.[4] She was, however, represented by counsel at trial. After trial, the juvenile court found that appellant was an unfit parent and that she had abandoned M.S. under Utah Code Ann. § 78–3a–48(1)(a) and (b) (1987), and ordered the termination of her parental rights.

## ISSUES AND STANDARD OF REVIEW

■ Appellant argues on appeal that the evidence was not sufficiently clear and convincing to sustain a finding of unfitness or of abandonment. We overturn findings of fact in a parental termination proceeding only if they are clearly erroneous. *In re*

---

3. The juvenile court's findings state that appellant made only five visits. However, the report to the court prepared by the DFS caseworker, supplemented by the caseworker's testimony, suggests that six visits were made.

4. In her brief, appellant argues that the only evidence that she was not in Utah at this time was the "speculation" of the DFS caseworker at

*J.D.M.*, 808 P.2d 1122, 1124–25 (Utah App. 1991); Utah R.Civ.P. 52(a). To obtain a reversal on clear error grounds, an appellant must marshal all the evidence supporting the challenged findings and then show that despite that evidence, the findings are clearly lacking in support. *J.D.M.*, 808 P.2d at 1124–25.

The evidence-marshaling requirement applies to sufficiency of the evidence challenges in both civil and criminal cases, whether tried to the bench or to a jury. *State v. Moore*, 802 P.2d 732, 738–39 (Utah App.1990). Additionally, one year before appellant's brief was filed in this case, we specifically stated that this requirement applies in parental termination cases. *State in the interest of P.H. v. Harrison*, 783 P.2d 565, 566 n. 1 (Utah App.1989). Accordingly, we include in our analysis of appellant's argument, the extent to which she has met this evidence-marshaling requirement.

## ANALYSIS

### Abandonment

■ Under Utah's statute governing the termination of parental rights, a prima facie case of abandonment exists when a parent surrenders custody of a child and then fails to show a firm intention to resume custody:

It is prima facie evidence of abandonment that the parent or parents, although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following the surrender have not manifested to the child or to the person having the physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child[.]

---

trial. However, counsel for appellant at trial represented to the court that appellant was still out of state, and in fact made a motion to compel the State to pay the cost of her return for trial, arguing that appellant could not afford such travel. As to the outcome of this motion, see footnote 6, *infra*.

Utah Code Ann. § 78–3a–48(1)(b) (1987). Under this provision, once a prima facie case of abandonment is shown, the burden shifts to the parent to rebut abandonment. *State in the interest of J.R.T. v. Timperly,* 750 P.2d 1234, 1237 (Utah App.1988).

■ The statute, which does not define abandonment but merely provides a method of proving a prima facie case, is supplemented by the definition set forth in *State in the interest of Summers Children v. Wulffenstein,* 560 P.2d 331, 333 (Utah 1977): "[A]bandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." (quoting *In re D.M. v. State,* 515 P.2d 1234, 1237 (Alaska 1973)). *See also In re J.D.M.,* 808 P.2d 1122, 1124–27 (Utah App.1991); *State in the interest of J.R.T. v. Timperly,* 750 P.2d 1234, 1236–37 (Utah App.1988). According to Utah caselaw, abandonment can be proven by "either objective evidence of the parent's conduct or by the expressed, subjective intent of the parent." *In the interest of J.C.O. v. Anderson,* 734 P.2d 458, 462 (Utah 1987).

■ Appellant first argues that Salata, not she, agreed to let DFS take physical custody of M.S. in June 1988, and that she therefore did not surrender custody of M.S. within the meaning of section 78–3a–48(1)(b). This contention ignores the evidence that when approached about putting M.S. into shelter at that time, appellant stated that she did not care, and left the decision to Salata. By thus abdicating her participation in this decision, appellant effectively surrendered custody of M.S.

■ Next appellant claims that no prima facie case of statutory abandonment was shown, because she did show a "firm intention to resume physical custody or to make arrangements for the care of" M.S. in the six months following his surrender. The only evidence she has marshaled in this regard is that which supports her claim, consisting of her passive attendance with Salata at the aborted June 21, 1988 meeting with a psychiatric social worker. She overlooks her failure to visit M.S. for over six months following this meeting, and the absence of any evidence that she ever contacted DFS about M.S. during this period. Therefore, she has failed to show clear error in finding that a prima facie case of abandonment was established under section 78–3a–48(1)(b).

As shown by the foregoing, a prima facie case of abandonment was established by appellant's conduct in the six months following her surrender of M.S. to DFS. At trial, appellant presented no evidence to rebut the statutory presumption of abandonment. Because under *Timperly,* such rebuttal evidence must relate to parental conduct within the six month statutory period, 750 P.2d at 1237, our affirmance of statutory abandonment might legitimately stop here. However, because of the constitutional magnitude of the parent-child relationship, *see, e.g., In re J.P.,* 648 P.2d 1364, 1372–74 (Utah 1982), we will, as did the trial court, also review the evidence relating to appellant's conduct after the six month statutory abandonment period elapsed.[5] We conclude that abandonment was not rebutted during this time, either.

Appellant's five or six visits with M.S. in early 1989 were but a brief interruption of a maternal absence that lasted from June 1988 through trial in January 1990. Even then, appellant visited only with Salata, and refused to visit her son by herself. Indeed, there is no evidence in the record that appellant ever took any measures independent of those pursued by Salata that might show a firm intention on her part to resume custody of M.S. or otherwise provide for his care. Appellant's failure to attend trial, or to communicate in any way with DFS or the juvenile court regarding the termination proceeding, also belied any firm intention on her part to resume custo-

---

5. Although not argued on appeal—probably because she objected to admission of this evidence—we are also concerned that appellant's apparent hospitalization out of state during much of the six month statutory abandonment period might, especially if involuntary, rebut the presumption that she abandoned M.S.

dy of M.S.[6] Thus there was no error in determining that appellant did not rebut the presumption of abandonment.

As regards the *Wulffenstein* criteria for abandonment, appellant argues that in signing the January 1989 treatment plan and in showing improved interactions with M.S. during the visits made in connection with that treatment plan, she demonstrated due regard for her parental obligations. She ignores her own statements that support a contrary finding. These include the statement that she did not care whether M.S. be removed from the home in June 1988, her frequent reference to M.S. as "Mike's child," and finally her statement that she did not intend to visit M.S. when Salata could not visit him. This last statement was followed by appellant's departure from the state. The court did not err, therefore, in finding that through her statements and conduct, appellant showed a conscious disregard for her obligations as a parent.

The final *Wulffenstein* requirement for abandonment is the destruction of the parent-child relationship, brought on by the disregard of parental obligations. Appellant offers no argument on this element of abandonment, and we are satisfied that it was adequately proven at trial.

In sum, there was sufficient evidence to clearly and convincingly prove that appellant abandoned M.S., under both the statutory and caselaw-derived tests. Therefore, the termination of her parental rights in M.S. on the ground of abandonment is affirmed.

### Parental Unfitness

Because we have affirmed on the basis of abandonment, we need not consider whether the evidence was also sufficient to show that appellant is an unfit parent. We are concerned that while the State's allegation of unfitness rested upon its contention that appellant is mentally ill, no formal psychological evaluation was performed to confirm that diagnosis. Nor does it appear that an adequate foundation was laid to admit much of the other evidence of appellant's illness. Because the termination of parental rights is a drastic step, we encourage future litigants in such proceedings to thoroughly develop the reliability of the evidence offered to prove parental unfitness.

## CONCLUSION

Because the evidence was sufficient to find that appellant abandoned M.S., the trial court's termination of appellant's parental rights in M.S. is affirmed.

BILLINGS and JACKSON, JJ., concur.

---

**6.** Not until trial was under way did appellant, through counsel, move that the State pay her expenses to return to Utah for trial. This motion was denied as untimely. When the motion was made, the State also observed that appellant had somehow found the means to leave Utah, and could reasonably also be expected to find the means to return.