STATE of Utah, Plaintiff and Appellee,

v.

Steven Ray ALLEN, Defendant and Appellant.

No. 900156.

Supreme Court of Utah.

Sept. 4, 1992.

R. Paul Van Dam, Christine Soltis, Salt Lake City, for plaintiff and appellee.

Michael H. Wray, Salt Lake City, Eric P. Swenson, Monticello, for defendant and appellant.

HALL, Chief Justice:

Defendant Steven Ray Allen appeals his conviction of second degree murder.[1]

Defendant, a well-educated college graduate, left his employment with the Idaho Nuclear Energy Air Laboratory in 1982 and opted to live the reclusive lifestyle of a mountain man. He took up residence in the high country near the Idaho–Montana border and lived there as a mountain man until 1986.

Defendant moved to Moab, Utah, in September 1986. There he met Deborah Barrie, the mother of two children, three-year-old Michael and five-year-old Matthew. Within two weeks of defendant's involvement with Barrie, Michael began sustaining injuries. In early October 1986, Barrie left her children alone with defendant for two

hours. When she returned, Michael's nose, forehead, and hands were scraped and he had a bump on his forehead. Defendant said that Michael had failed to put his hands out to catch himself as he fell.

Defendant moved in with Barrie. Throughout their relationship, they argued about the children. Defendant viewed them as undisciplined and felt that Barrie failed to sufficiently control them. Barrie confronted defendant about his harsh attitude toward the children. He responded that the boys were "damn bawl babies" and that he "had put up with enough bull——t in his life" and wasn't "about to put [up] with any more from a little kid."

Michael's personality and appearance changed. He expressed reluctance to stay alone with defendant. He cringed if picked up under his armpits. He developed a bald spot the size of a silver dollar on the back of his head. He had numerous bruises over his body. His balance and eyesight seemed poor. He complained of stomachaches and headaches, became "clingy," and cried a lot.

Barrie observed bruising on Michael's bottom and confronted defendant. Defendant said that when Michael had failed to help him carry some wood, he had kicked him. Defendant claimed that he had been barefoot and that he had not done it that hard or that many times. He stated that Michael must have something medically wrong with him to bruise as he did.

Barrie took Michael to the doctor about his bruises and lack of balance. The doctor pressed on Michael's stomach and spine but not on his rib area. The doctor ordered no x-rays but prescribed a suppository and Tylenol. When Barrie told defendant that the doctor had found nothing wrong with Michael, he said, "See, I told you he was playing little games with you."

In late November, Barrie and defendant bought a motorcycle. When defendant asked Michael to come for a ride, Michael started crying. Defendant told Barrie to "boot [Michael's] butt." Reluctantly, Michael went. When they returned, Michael

1. In violation of Utah Code Ann. § 76-5-203.

was tearful and silent. Defendant stated that he had hit some loose gravel and tipped the motorcycle over but that neither of them got hurt. Barrie examined Michael and found a bump on his forehead. She noticed that his eyes were not focused and thought he had a slight concussion.

On December 14, 1986, two days before he died, Michael started crying in the morning. When Barrie was unable to stop the crying, defendant grabbed Michael and took him to the basement. Barrie followed when she heard muffled sounds. She saw defendant hanging the child by the hood of his coat. Michael's face was red and his eyes were bulging. He was not struggling, but was hanging limp. When Barrie shouted that Michael wasn't breathing, defendant replied that he knew and that he didn't care. After more argument, defendant finally let go. Barrie carried Michael to her pickup and left.

When she returned that night, she and defendant argued about his treatment of the children. Defendant admitted that he had backhanded Michael, knocking him onto the cement basement floor. He stated that if he was not going to be allowed to discipline Michael, Barrie had better keep the child "out of his face." The argument continued the next day. Defendant claimed that Michael was coming between them. Later, Matthew overheard defendant tell Michael that he hated him.

The next morning, defendant, Barrie, and the children drove to Moab. After several stops, they went to the Yellow Front store. Defendant "winked" at Michael and suggested that the child "spend some time with him." Michael was unhappy when his mother left, but he continued to sit in the truck and eat some candy he had been given. Approximately five minutes later, defendant came into the store and yelled for Barrie. He was holding Michael, who was limp and white and did not appear to be breathing. Barrie drove to the hospital, with defendant holding Michael on the passenger side. She thought defendant was performing mouth-to-mouth resuscitation. They reached the hospital, and Barrie ran into the emergency room for help. When she returned, defendant was holding the child but not performing resuscitation. Medical personnel unsuccessfully worked on Michael, who remained unresponsive, until the attending physician, Dr. Robert Murray, declared him dead.

Hospital personnel asked what had happened. Defendant said that he was reading and Michael was eating his candy. Michael said something and suddenly rolled his eyes back in his head, arched his back, and gasped for air. Defendant thought he was choking so he put his finger down the child's throat but found nothing. Defendant told others that Michael acted like he had a seizure. Dr. Murray thought that Michael may have had an aneurism but concluded that an autopsy was necessary to determine the cause of death. Barrie refused an autopsy because she did not want them "to cut up her baby." The child was subsequently embalmed.

The next morning, defendant and Barrie left for Idaho to bury Michael at her family home. That night, they stayed in Bountiful, Utah. Authorities twice contacted them there for permission for an autopsy. Barrie continued to refuse. Defendant told her that the police were raising questions about him. Bruises which had not been apparent on the body in the hospital were now evident. Defendant said the bruises looked suspicious. He told Barrie that if she "was looking for something bad, [she would] find it."

Defendant told Barrie that he had read her daily journal and that it related their fights over the discipline of the children. He said that if the police came back and searched, the journal would amount to "probable cause" to take the child's body for an autopsy. He persuaded Barrie to let him rip out several pages of the journal and destroy them.

Defendant and Barrie proceeded to Ririe, Idaho, with Michael's body. The child was buried there on December 20, 1986. Defendant left for the Delores River area of Idaho while Barrie remained in Ririe with Matthew. Matthew told his mother that he had seen defendant "punch and kick" Michael and that similar things had been done

to him. Barrie decided that she would allow an autopsy. Defendant returned to Ririe to reunite with Barrie. She told him about her decision to allow the autopsy. He became angry with her and accused her of trying to make him look bad. He then gave an account of how the child had died that conflicted with the account he had previously given to Dr. Murray. When the reunion proved unsuccessful, he returned to the Idaho mountains.

Michael's body was exhumed and an autopsy performed on April 12 and 13, 1987. Based on the results of that autopsy, an information was filed, charging defendant with the death of the child. After an extensive manhunt, defendant was arrested on August 12, 1989, by officers of the Ravalli County, Montana Sheriff's office under fugitive warrants issued as a result of the charges filed in Utah. The officers located defendant high in the mountains of the Continental Divide near the Idaho–Montana border. They flew in by helicopter and captured defendant on the Idaho side of the border and then took defendant by helicopter to the Ravalli County jail.

Defendant maintains that he was physically and verbally abused during the arrest by the Montana officers. He contends the following: He was tightly handcuffed and was told to cooperate if he wanted the cuffs loosened. One deputy jerked him up by his hair to take his picture. Another threatened to tie him to the helicopter and "drag him all over Ravalli county." He was struck in the groin, was strip-searched, and was told how lucky he was that the officers did not kill him and save the county a lot of money. Sheriff Printz, who was in charge of the arrest, told him that he would put a bullet in his head if he tried to cause the helicopter to crash.

After the arrest, defendant was taken to the Ravalli County jail. Some thirty hours after defendant's arrest, Sheriff Printz and Michael Hines, a Utah investigator, interviewed defendant concerning the charges against him. This unrecorded interview took place before defendant could be arraigned. The interview lasted about one and a half hours and took place without counsel present. Mr. Hines testified that he read defendant his *Miranda* rights from a form. However, the "Warning and Waiver of Rights" portion of the form, which acknowledges that the defendant understands his rights, was not read to defendant, and the signature line at the bottom of the form was not signed by defendant.

Defendant contends that he expressly and impliedly requested counsel both during his processing at the jail and at the interview with Hines and Printz. The State disputes these claims, stating that at no time prior to or during the interview did defendant equivocally or unequivocally request that he have counsel present.

During his interview with Hines and Printz, defendant initially denied ever hitting or hurting Michael. Hines said that he did not believe defendant and told him that he suspected the following sequence of events: The child was crying, this crying frustrated defendant, defendant got very rough with the child because he was crying, this caused the child to get even more hysterical and cry louder, and defendant grabbed the child by the nose and the mouth and held him very hard and that is what killed Michael.

After this description, defendant's demeanor changed, and he became very emotional and teary-eyed. Defendant responded that he could not "believe that [Hines had] figured out exactly what happened.... I've knocked the kid around a few times, but I didn't—I didn't intend to kill him." Defendant stated that Michael opened the door of the truck and slid out. Defendant grabbed him by the collar and jerked him back into the truck really hard. The child stood in the truck crying. Defendant then backhanded Michael in the stomach very hard. After relating these facts, defendant paused and then stated, "He just went limp and fell down."

Prior to trial, defendant moved to have the confession given at the Ravalli County jail suppressed. Defendant contended that the abusive nature of his arrest, his denial of requested counsel, and the fact that the Montana deputies had illegally taken him across the state line into Montana from

Idaho rendered the confession illegal and involuntary. As evidence, defendant testified concerning the nature of his arrest and subsequent interrogation. He also offered a recording produced when a sheriff's deputy inadvertently left on a pocket tape recorder during most of the portions of the arrest at which defendant claims he was abused. At the motion to suppress defendant's subsequently obtained confession, the trial court accepted a written transcript of the tape but declined to actually listen to it. Defendant's motion was denied.

Defendant was tried before a jury from February 26 through March 2, 1990, for second degree murder. At trial, testimony of various medical experts was introduced to establish the nature of Michael's injuries and the information known about the cause of his death. Dr. Floyd J. Fantelli testified that Michael had a total of eleven fractured ribs. Most of the ribs appeared to have been fractured two to six weeks prior to death. However, one of the fractures, rib 7 on the right side, occurred within hours of Michael's death. Based on the bleeding at the fracture site, Dr. Fantelli concluded that the fracture occurred before Michael's heart stopped beating and prior to cardiac resuscitation efforts. The nature of the fracture was consistent with a substantial hit in the chest area by an adult fist.

The body also exhibited significant bruising of varying ages. In addition to many old bruises, several new bruises were estimated to have occurred at or near the time of death. Number 1 was a one-inch by one-inch bruise on the right temple. It was consistent with pressure from a finger or thumb, but the pressure needed to create the bruise was too great for it to have been caused during resuscitation. Number 12 also was a fresh bruise. It was under the jaw bone, a highly unusual location for an accidental bruise. This bruise was consistent with a blow or sustained pressure. Because of its unique location, Dr. Fantelli found it unlikely to have occurred during resuscitation. Numbers 13, 14, and 15, small finger-type bruises on Michael's chest, were in a knuckle-type pattern, consistent with a backhanded blow to the chest. Dr. Fantelli concluded that due to their location, such bruising would be inconsistent with any resuscitation efforts. Dr. Fantelli found two "marks" just behind the left eye. These appeared fresh and were consistent with pressure from adult fingernails. The bruise on the chin, together with the fingernail marks near the eye, was consistent with an adult hand placed over Michael's face with pressure substantially greater than that required in resuscitating an unconscious person.

Based on the lack of information concerning Michael's family background, Dr. Fantelli concluded that he could not be medically "diagnostic" of the presence of battered-child syndrome. However, he was "diagnostic" that the injuries occurred from significant trauma and were therefore consistent with battered-child syndrome.

While Dr. Fantelli was unable to determine the exact cause of death, he did rule out any natural causes. He did not find cardiac problems, indications of seizure or aneurism, or injuries to Michael's internal organs. There were indications of cerebral edema, mild swelling of the brain caused by a lack of oxygen at the time of death, but no evidence of choking or aspiration on an object. Instead, the lack of oxygen, coupled with Michael's physical bruising and marks, was consistent with, but not "diagnostic" of, suffocation. If Michael had been suffocated by someone placing a hand over his mouth, his respiratory efforts would have stopped within two to three minutes and his heart within another minute or so. Within a total of three to five minutes, Michael would have been dead.

Dr. William M. Palmer, an expert in child abuse cases, while agreeing with Dr. Fantelli's autopsy findings, testified that the injuries sustained by Michael were diagnostic of battered-child syndrome. Dr. Palmer agreed that there was no indication of a natural cause of death and no indication of accidental death. Similarly, he found no evidence of choking, aspiration, or strangulation. Dr. Palmer found the physical evidence, though not diagnostic of suffocation, to be consistent with suffocation

caused by an adult hand placed over the child's mouth and nose.

In addition to the evidence presented by the medical experts, the State presented testimony by Deborah Barrie, Matthew Barrie, and Martha Sutherland concerning the prior acts of violence upon Michael. Matthew Barrie testified that as long as his mother was around, defendant treated them nicely, but when she was gone, defendant would "be mean to us and kick us and be really mean." Matthew saw defendant hurt Michael on several occasions, usually by punching him in the stomach. Once, Matthew saw defendant punch Michael in the chest area and knock him down. More than once, Matthew saw defendant kick Michael, usually with his hiking shoes, on the bottom, but sometimes up higher. Matthew did not see anyone other than defendant hurt Michael in this way.

Martha Sullivan, Michael's twelve-year-old cousin, also saw defendant hurt Michael. She saw him drag Michael by the hair and lift his feet off the ground. Another time, when Michael would not stop crying, she saw defendant angrily force him to sit in the snow, clad only in his underwear.

At the close of the trial, the jury returned a verdict of guilty as charged. Defendant moved to arrest judgment on the basis of insufficient evidence. That motion was denied on March 12, 1990, and defendant was sentenced to the statutory term of five years to life in the Utah state prison. Defendant then moved for a new trial on the basis of insufficient evidence and erroneous trial rulings. The motion for new trial was denied, and defendant filed this appeal, raising numerous fact-oriented issues.

## I. BATTERED–CHILD SYNDROME

■ Defendant contends that battered-child syndrome evidence is inadmissible in the absence of a showing of a conclusive cause of death that is consistent with the pattern of prior abusive conduct. However, the very nature of the syndrome dispels that contention. As the court observed in *State v. Tanner*,[2] the syndrome is necessarily based upon varying types of unexplained injuries. It is a series of injuries which reflect a pattern of relevant nonaccidental activity.[3]

■ Defendant also advances the argument that the introduction of evidence of battered-child syndrome was unduly prejudicial since it allowed the jury to infer that the prior incidents of abuse were factually or medically related to the cause of death. It is true that evidence of the prior injuries had a factual relationship to the cause of death by establishing circumstantially that someone in a custodial position consistently and intentionally abused the child physically. However, the medical testimony of Dr. Fantelli was clear that the older bruises and fractures did not contribute to or culminate in Michael's death. Furthermore, the prosecution made no contention and offered no evidence that they did so relate.

■ The prosecution presented evidence of defendant's prior abuse of Michael in corroboration of battered-child syndrome. Defendant concedes the admissibility of such evidence as a general proposition,[4] but in this instance contends for inadmissibility on the ground of remoteness. This contention is without merit because all the incidents of abuse occurred within two months of Michael's death. Also, the incidents were not isolated events. Rather, they constituted a pattern of abusive conduct that began quickly following defendant's initial acquaintance with Michael and continued up to the day of death.[5]

## II. BILL OF PARTICULARS AND ELECTION OF THEORIES

Defendant was denied a bill of particulars, and his motion to compel the prosecution to elect which theory it was proceeding upon was also denied. He now claims prej-

---

**2.** 675 P.2d 539 (Utah 1983).

**3.** *Id.* at 542–43.

**4.** As provided by Utah Rule of Evidence 404(b).

**5.** *See Tanner,* 675 P.2d at 542–43.

udicial error in the trial court's failure to narrow the factual issues.

■■■ Utah Rule of Criminal Procedure 4(e) provides for a bill of particulars when the facts necessary to inform a defendant of the nature and cause of the offense charged are not otherwise made known or set forth in an information or indictment. However, a bill of particulars is not available to compel the prosecution to disclose all the evidence which may be introduced at trial.[6] Furthermore, the prosecution need not disclose the exact theory upon which it intends to proceed.[7] What is required is that the defendant be apprised of the particulars of the alleged conduct so as to permit adequate preparation of a defense.[8] Entitlement to a bill of particulars as a matter of right occurs only when the information or indictment is constitutionally deficient by reason of its failure to inform of the nature and cause of the offense charged.[9]

■■■ In this instance, an extensive probable cause statement accompanied the information filed. The statement contained the facts bearing upon defendant's prior abuse of Michael, the battered-child syndrome, the events of the day on which the death occurred, defendant's destruction of portions of the diary, the autopsy report, and the medical opinion of cause of death by suffocation.

In response to defendant's motion for a bill of particulars, the prosecution furnished a memorandum stating the facts relied upon for the cause of death, specifically referring to defendant's reaction to Hines's assertion that defendant had suffocated Michael. It thus appears that the trial court did not abuse its discretion[10] in concluding that defendant was sufficiently apprised of the cause of death and defendant's specific acts relied upon in support of the offense charged to enable him to adequately prepare a defense.[11]

### III. GENERAL VERDICT

At trial, defendant proposed the use of a general verdict, but suggested that it be supplemented with interrogatories requiring the jury to focus on and identify the cause of death and thus minimize the evidence of defendant's prior acts of abuse. The trial judge declined the request, concluding that the content of the interrogatories could be adequately addressed in appropriate instructions to the jury.

■■■ Utah Rule of Civil Procedure 49 permits the use of special interrogatories.[12] However, it lies within the broad discretion of the trial court to determine if special interrogatories are to be used and, if so, the content thereof.[13] Given the facts and circumstances of this case, the court did not abuse its discretion in declining to permit the use of a special verdict.

### IV. CONFESSION

Defendant challenges the admission of incriminating statements he made to Officer Hines on essentially two grounds. First, he argues that his statements should have been suppressed because Hines intentionally failed to appropriately inform him of his *Miranda* rights[14] and that he explicitly and implicitly requested counsel prior

6. *State v. Mitchell,* 571 P.2d 1351, 1353 (Utah 1977).

7. *State v. Butler,* 560 P.2d 1136, 1138 (Utah 1977).

8. *State v. Bell,* 770 P.2d 100, 103–04 (Utah 1988).

9. *State v. Fulton,* 742 P.2d 1208, 1214 (Utah 1987), *cert. denied,* 484 U.S. 1044, 108 S.Ct. 777, 98 L.Ed.2d 864 (1988).

10. *Bell,* 770 P.2d at 104.

11. *Accord State v. Strand,* 720 P.2d 425, 428 (Utah 1986); *Butler,* 560 P.2d at 1138.

12. Made applicable in criminal cases by Utah Rule of Civil Procedure 81(e). *See Bell,* 770 P.2d at 109.

13. *E.A. Strout W. Realty Agency, Inc. v. W.C. Foy & Sons,* 665 P.2d 1320, 1324 (Utah 1983). We note that in criminal cases, special verdicts or interrogatories may not be used without the consent of the defendant. *Bell,* 770 P.2d at 109 n. 19.

14. *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630–31, 16 L.Ed.2d 694 (1966).

to and during the interrogation, which requests went unheeded. Second, he maintains that he was illegally arrested and verbally and physically abused by Montana law enforcement officers at the time of his arrest and that these events tainted his incriminating statements given to Hines a day and a half later. We address each argument in turn.

## A. *The Miranda Warning and Requests for Counsel*

Defendant makes two related arguments in which he claims that his fifth and sixth amendment rights were violated. He first maintains that Hines's failure to read the "Warning and Waiver of Rights" portion of the *Miranda* form was intentional and thus compromised the protection afforded him under *Miranda* to ensure a knowing and intelligent waiver of his fifth and sixth amendment rights.[15] This argument is without merit.

■ The record shows that defendant was adequately informed of his *Miranda* rights. Hines testified that he read the *Miranda* rights from the form and then more fully explained them. Defendant, a well-educated college graduate, responded that he would talk to Hines without an attorney but that he would choose which questions to answer. Defendant also testified at the suppression hearing that he understood that he need not answer any questions and that he told Hines that "they could ask the questions, but I felt that if I didn't feel the question was right, that I didn't feel like—unless my attorney told me that I should respond, that I should respond." Sheriff Printz was also present during the interrogation, and he testified at the suppression hearing of defendant's willingness to speak to Hines.

As the interrogation proceeded, defendant occasionally declined to answer a question, but he never requested that the interrogation cease. The interrogation spanned a period of an hour and a half, and not until the conclusion thereof did defendant inquire if an attorney would be provided in connection with extradition proceedings.

Defendant argues that he explicitly and implicitly requested counsel at various times before and during his interview with Hines. Defendant points out that under *Edwards v. Arizona*,[16] the police were required to terminate further questioning until he was provided with or waived his right to counsel. Because the questioning was not terminated, he contends, his constitutional rights were violated. We are not persuaded.

■ Defendant claims that he implicitly requested counsel by spontaneously shouting "read me my rights" and another time by telling an officer that he would not give his name but would talk to another officer. We simply do not think that these remarks can be reasonably construed to be a request for counsel.[17] Defendant also claims that a jailer told him that he could call an attorney and that he expressed a desire to do so. However, the jailer disagreed with this version of the facts, and the trial judge obviously believed that the jailer was more credible. In the face of a factual dispute which necessarily bears upon credibility, it was for the trial court to appropriately weigh the evidence and assess the credibility of the witnesses.[18] There is nothing in the record to indicate that the judge was clearly in error in giving more credence to the jailer's testimony.

■ Finally, defendant claims that during the interrogation, he requested counsel explicitly and implicitly by refusing to answer certain questions. Regarding his claim of explicitly requesting counsel during the interview, both Hines and Printz testified that such a request was not made. Again, it was for the trial court to believe Hines and Printz instead of defendant, and there is no indication in the record that the

---

15. *See Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182 (1974).

16. 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981).

17. *See McNeil v. Wisconsin,* —— U.S. ——, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991).

18. *State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987).

trial court erred in so concluding. Regarding his claim that his refusal to answer questions constitutes at least an equivocal request for counsel,[19] we disagree. Merely refusing to answer questions, without more, cannot reasonably be construed as a request for counsel.

### B. *Exploitation of the Alleged Abuse*

■ We now turn to defendant's claim that his incriminating statements were constitutionally tainted by police misconduct that occurred when he was arrested. In determining the validity of a confession or incriminating statements following police illegality, two inquiries must be made.[20] First, the court must determine "voluntariness," i.e., whether the confession was voluntary; second, the court must determine "attenuation," i.e., whether the confession was obtained in the course of police exploitation of the prior illegality or, in other words, whether the voluntary confession was sufficiently attenuated from the prior police misconduct to remove any taint.[21] The confession must meet both tests to be admissible.[22]

### 1. Voluntariness

■ In the face of a challenge to the voluntariness of a statement or confession, it is incumbent upon the prosecution to demonstrate by a preponderance of the evidence that the statement was made voluntarily based upon the totality of the circumstances.[23] As was observed in *State v. Bishop*, the inquiry into voluntariness is never mechanical, but must duly consider both the characteristics of the accused and the details of the interrogation.[24] The ulti-

mate inquiry is, of course, whether physical or psychological force or other improper threats or promises prompted the accused to talk when he otherwise would not have done so.[25]

■ In light of these standards, the trial court's determination that defendant's inculpatory statements were voluntarily made is amply supported by the evidence adduced at the suppression hearing. Defendant's challenge to the voluntariness of his statements rests solely on the alleged abuse he received when he was arrested *a day and a half* prior to the interview. He does not allege that any coercion occurred during the interview itself, nor does the record suggest any. Once he was placed in jail, he had no further contact with the arresting officers except for Sheriff Printz. Prior to questioning, Hines, in the presence of Printz, informed defendant of his *Miranda* rights, which we have held constitutionally sufficient. Defendant himself testified at the suppression hearing that he was never physically afraid during the interview and that Hines made no threats or promises to induce him to talk. Based on these facts, we conclude that defendant voluntarily made the statements.[26]

### 2. Exploitation

Our analysis does not end here. Regardless of whether defendant's statements were voluntary, we must also determine whether they were obtained in the course of police illegality.[27] In *Arroyo*, we noted four factors that courts should consider when determining whether a voluntary confession is constitutionally "tainted" by pri-

---

19. *See Smith v. Illinois*, 469 U.S. 91, 96 & n. 3, 105 S.Ct. 490, 493 & n. 3, 83 L.Ed.2d 488 (1984).

20. *Brown v. Illinois*, 422 U.S. 590, 601–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *cf. State v. Arroyo*, 796 P.2d 684, 688 (Utah 1990). *See generally* 4 Wayne F. LaFave, *Search & Seizure* § 11.4(b) (1987 & Supp.1992).

21. *See Brown*, 422 U.S. at 601–04, 95 S.Ct. at 2260–62; *cf. Arroyo*, 796 P.2d at 688.

22. *Brown*, 422 U.S. at 601–02, 95 S.Ct. at 2260–61; *Arroyo*, 796 P.2d at 688.

23. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *State v. Bishop*, 753 P.2d 439, 463 (Utah 1988).

24. *Bishop*, 753 P.2d at 463 (quoting *United States v. Gordon*, 638 F.Supp. 1120, 1145 (W.D.La. 1986)).

25. *Id.* at 464 n. 75.

26. *See Bishop*, 753 P.2d at 464 & n. 76.

27. *Brown*, 422 U.S. at 601–04, 95 S.Ct. at 2260–62; *cf. Arroyo*, 796 P.2d at 688.

or police misconduct: whether *Miranda* warnings were given, the temporal proximity of the illegality and the confession, the absence or presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.[28]

Assuming, without deciding, that the arrest was illegal or at least accompanied by police misconduct, defendant's statements were sufficiently attenuated from the alleged misconduct to remove any taint. Defendant was informed of his *Miranda* rights, and he understood that he could refuse to answer any questions during the interview which resulted in incriminating statements. He made the incriminating statements a day and a half after the arrest—a sufficient period of time for the tension that arose during the arrest to subside considerably, if not completely. Nothing in the record indicates that the alleged misconduct was to aid in the investigation. Nor does the record indicate that the behavior of the officers in arresting defendant was flagrant, in light of his belligerence and uncooperative attitude. Finally, the Montana officers appear to have crossed into Idaho to make the arrest because they believed they were in hot pursuit, and defendant suggests no other motive. In sum, even if the officers' actions in arresting defendant were improper, his statements were voluntarily made and not tainted by the events that occurred during his arrest.

### C. *Due Process Challenge*

Defendant makes two other claims in regard to the incriminating statements he made to Hines. He challenges the trial court's refusal to admit the tape of his arrest at trial on due process grounds. He contends that the circumstances of his arrest were relevant to the jury's assessment of his subsequent statements. However, based upon the trial court's finding no causal connection between the arrest and the subsequent statements, no denial of due process exists. This is particularly so in light of the fact that defendant makes no claim that his statements were in any respect coerced. Furthermore, the trial court concluded that the jury would not be aided by listening to the tape and, in fact, may well be sidetracked from the ultimate issues to be determined by any improprieties engaged in by the officers in effecting the arrest. The trial court viewed the tape as a recording of only a portion of the arrest procedures, not as a recording of the entire sequence of events. Therefore, the court excluded the tape pursuant to the provisions of Utah Rule of Evidence 403 because the prejudicial effect on the trial proceedings would greatly outweigh any relevance of the evidence. Such did not constitute an abuse of discretion.

### D. *Corpus Delicti Challenge*

Defendant contends that his confession was introduced at trial prior to the establishment of the corpus delicti of murder. Specifically, he argues that the State had the burden to prove the cause, method, and manner of the child's death.

A confession is not sufficient to support a conviction absent independent evidence of the corpus delicti of the crime charged.[29] However, the actual cause of death is not a component of the corpus delicti of murder. To satisfy the doctrine, the State need only present clear and convincing evidence that the specified offense occurred and that it was perpetrated by criminal conduct.[30] The corpus delicti of murder has two components: (1) proof that the victim actually died and (2) proof that the death was caused by criminal means.[31] Proof of the latter component does not require proof of the actual cause of death. Rather, "'the State need only present evidence that the death resulted from criminal conduct rather than by accident or from

---

**28.** 796 P.2d at 690–91 n. 4 (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62).

**29.** *Bishop,* 753 P.2d at 477–78 (citing *State v. Knoefler,* 563 P.2d 175, 176 (Utah 1977)).

**30.** *Id.* at 478 (citing *State v. Kimbel,* 620 P.2d 515, 517 (Utah 1980)).

**31.** *Id.* at 478 (citing *State v. Rebeterano,* 681 P.2d 1265, 1267 (Utah 1984)).

natural causes.' " [32]

■ In this case, the medical evidence was sufficient to establish that death did not occur from natural causes or by accidental means. Taken as a whole, the evidence offered prior to the admission of the confession adequately established the corpus delicti.

■ Defendant's remaining contention concerning his confession is that the trial court failed to make adequate findings of fact and conclusions of law regarding the waiver of *Miranda* rights and the voluntariness of the confession. Inasmuch as this issue is raised for the first time on appeal, in the absence of exceptional circumstances we decline to address it. [33]

## V. LESSER INCLUDED OFFENSES

■ The trial court instructed the jury on the lesser included offense of manslaughter, but declined to give the instructions on the offense of negligent homicide proposed by defendant. We do not need to reach the merits of this claim because even assuming that it was error not to instruct on negligent homicide, we find that the failure to give the instruction was harmless. [34] The jury was instructed on the lesser included offense of manslaughter. By convicting defendant of the greater offense of second degree murder, the jury necessarily was called upon to consider whether he acted with any lesser mental state than that required to convict of second degree murder. Having rejected that alternative, there is no reasonable likelihood that if an instruction on negligent homicide had been given, the jury would have convicted of that offense rather than second degree murder. [35]

## VI. AUTOPSY PHOTOGRAPHS

Defendant asserts that the autopsy photographs and the bruises they depict are not relevant to the issues of cause, method, or manner of death and that to the extent that the photographs are relevant to show course of conduct or criminal intent, the medical testimony conveyed that information in a less inflammatory way. He also asserts that the photographs created a substantial danger of undue prejudice outweighing their essential value as evidence and that they depicted nothing that would permit the jurors to discern the age of the injuries or what in fact caused them.

■ As a general rule, all relevant evidence is admissible. [36] Relevant evidence is evidence that has any tendency to make the existence of any material fact more or less probable than it would be without the evidence. [37] Although relevant, evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, or misleading the jury. [38] However, in certain categories of relevant evidence, such as gruesome photographs, there is an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury. [39] In those instances, we reverse the normal presumption in favor of admissibility and instead presume the proffered evidence to be inadmissible unless the proponent shows that it has unusual probative value. [40]

Photographs of victims are always sobering and graphic, and indeed, they fit within the adage "a picture speaks a thousand words." However, photographs that are not gruesome have little potential for unduly prejudicing a jury, and thus, we presume

---

**32.** *Id.* (quoting *State v. Petree,* 659 P.2d 443, 444 (Utah 1983)).

**33.** *State v. Steggell,* 660 P.2d 252, 254 (Utah 1983).

**34.** *See State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992).

**35.** *State v. Gotschall,* 782 P.2d 459, 464 (Utah 1989).

**36.** Utah R.Evid. 402.

**37.** Utah R.Evid. 401.

**38.** Utah R.Evid. 403.

**39.** *State v. Lafferty,* 749 P.2d 1239, 1256 (Utah 1988), *habeas corpus granted on other grounds in Lafferty v. Cook,* 949 F.2d 1546 (10th Cir. 1992).

**40.** *Id.*

that such photographs are admissible unless the defendant shows that the photographs have an unusual tendency to unfairly prejudice, inflame, or mislead the jury.[41]

 In this instance, the photographs do not depict open wounds, excessive blood, or any other condition that might be characterized as gruesome. They depict the intact body of the victim, and only the injured areas are visible. The injuries consist of bruising, fingernail marks, and a bald spot on the head. In short, the photographs are not gruesome. Consequently, defendant was required to show that the photographs' potential for prejudice substantially outweighed their probative value. He has not made this showing. Therefore, his challenge to the court's ruling to admit the photographs fails.

## VII. DESTRUCTION OF EVIDENCE

Prior to trial, defendant sought to preclude the victim's mother from testifying at trial that on the day following the death of the victim, defendant destroyed parts of her personal diary which related prior incidents of defendant's abuse of the victim. Defendant based his objection on hearsay grounds. The court ruled that the mother was not reconstructing the contents of the diary but simply testifying concerning defendant's conduct and statements about his reason for destroying parts of the diary. The court properly concluded that the issue was not one of hearsay but of relevancy.[42]

■ The diary was not admitted into evidence. The mother's testimony was directed only to defendant's conduct and statements regarding his interest in destroying some of the entries in the diary. The relevance of the testimony was that following the death of the victim, defendant destroyed evidence which he assessed as being inculpatory. Such conduct was relevant as an admission constituting circumstantial evidence of consciousness of guilt.[43]

## VIII. REMAINING ISSUES

Defendant advances several additional contentions bearing upon the sufficiency of the evidence, jury instructions, and cumulative error. All of these issues have been duly considered and determined to be without merit. In accord with the established principles of review applicable to all cases, civil and criminal, we decline to analyze and address in writing every issue or claim raised.[44]

Affirmed.

HOWE, Associate C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.

---

41. Utah R.Evid. 403; *see Lafferty,* 749 P.2d at 1256.

42. Utah R.Evid. 801(d)(2).

43. *State v. Garcia,* 663 P.2d 60, 65 (Utah 1983); *accord State v. Walker,* 226 Kan. 20, 595 P.2d 1098, 1100 (1979).

44. *State v. Carter,* 776 P.2d 886, 888–89 (Utah 1989).