STATE of Utah, in the interest of E.R., a person under eighteen years of age.

R.R., Defendant and Appellant,

v.

STATE of Utah, Plaintiff and Appellee.

No. 950381–CA.

Court of Appeals of Utah.

May 31, 1996.

L.G. Cutler, Salt Lake City, for Appellant.

Jan Graham and Carol L.C. Verdoia, Salt Lake City, for Appellee.

Kristin Fadel, Salt Lake City, Guardian Ad Litem.

Before DAVIS, Associate P.J., and BILLINGS and GREENWOOD, JJ.

DAVIS, Associate Presiding Judge:

Defendant challenges the trial court's termination of his parental rights pursuant to Utah Code Ann. §§ 78–3a–407(1), –408(1)(b) (Supp.1995). We affirm.

## FACTS

Defendant and S.E.R. were married in 1986. On November 3, 1986, their first and only child, E.R., was born in Missouri. Defendant and S.E.R. subsequently separated in April 1987.[1] Defendant visited his daughter approximately one month later and, when

---

1. Defendant believes he is still married to S.E.R.

he returned to S.E.R.'s residence in either the latter part of May 1987 or August 1987,[2] the residence was empty. After inquiry of the housing authority, defendant learned that S.E.R. had moved with the children,[3] leaving no forwarding address.[4] S.E.R. did not inform defendant where she was moving, nor did she inform defendant's parents. Defendant attempted to contact S.E.R.'s extended family but claimed they had also moved, leaving no forwarding address. In 1989, defendant attempted to locate his daughter but could not afford to pay an attorney. When he requested information regarding S.E.R.'s address from the Missouri child support enforcement agency, they informed him that they could not release that information.

Even though defendant had had no contact with either S.E.R. or E.R. since 1987, his wages were garnished for child support in the early part of 1993 and his 1992 tax refund was also intercepted to satisfy his child support obligation, which, as of March 17, 1993, was $9912.96. Interestingly, even though defendant claims that he did not know where S.E.R. and E.R. were until S.E.R. contacted him in 1993, defendant testified that he sent child support payments to S.E.R. in Salt Lake City in 1992. He asserts these payments were sent back to him.

The next contact defendant had with S.E.R. did not occur until September of 1993, when S.E.R. telephoned defendant's parents, requesting they give defendant her phone number. After receiving this information, defendant called S.E.R. and was able to speak to E.R., but only for a few seconds. Defendant received a letter from S.E.R. dated September 26, 1993. Approximately one week after receiving the letter, defendant again called and attempted to speak to E.R. However, she was outside playing and S.E.R. said it would take too long to go get her. Defendant testified he sent cards and letters to E.R. over the next couple of months, but never received any response. Defendant also sent E.R. a Christmas present, some clothes, and coloring books, in the first part of January 1994.[5]

On January 6, 1994, S.E.R.'s children, including E.R., were removed from S.E.R.'s care and placed in state custody. Defendant was informed of this development in January 1994 when he received a Notice of Appearance, dated January 19, 1994, from David Littlefield, the court-appointed Guardian Ad Litem. After receiving this notice from Mr. Littlefield, defendant responded by letter. Mr. Littlefield wrote defendant on March 11, 1994, informing defendant that the appropriate person to contact regarding the welfare of E.R. was Jamie Hayden, a caseworker from the Division of Family Services, who had been assigned to the case. Mr. Littlefield gave defendant Ms. Hayden's phone number and told defendant that he would forward defendant's letter to Ms. Hayden.[6] Mr. Littlefield's letter also informed defendant that there were two proceedings involving E.R., one in the juvenile court and one in the district court. Defendant was advised at this time to call the juvenile court[7] to request a court-appointed attorney. Defendant was also advised to retain private counsel for the district court matter.[8] Defendant did neither.

On March 25, 1994, defendant wrote to Ms. Hayden, expressing his interest in obtaining custody of E.R. Either in response to defen-

---

2. The testimony is conflicting on this date. Defendant testifies to the latter part of May 1987, while S.E.R. testified to August 1987.

3. S.E.R. also had an older daughter who lived with her.

4. S.E.R. testified that she moved to a town only 12 miles away from where she had lived with defendant. Not until 1988 did she move to Arizona. In 1990 S.E.R. relocated to Salt Lake City.

5. However, S.E.R. never gave the gift to E.R., justifying this failure by the fact that the children were already in state custody by this time and

that she wanted to exchange the clothes for a size that was more suitable for E.R.

6. Although Mr. Littlefield wrote that he would forward defendant's letter to Ms. Hayden, Ms. Hayden claims she never received it.

7. The juvenile court's phone number was included in the letter.

8. Defendant was also given the number to the Utah State Bar Lawyer Referral Service.

dant's letter to Mr. Littlefield or defendant's March 25 letter, Ms. Hayden corresponded with defendant on April 26, 1994.[9] In her letter, Ms. Hayden states, "I understand your desire as her father to get custody of [E.R.]." Ms. Hayden advised defendant to secure the aid of an attorney and informed him of a "review hearing" scheduled for May 26. Defendant was also given both E.R.'s phone number so that defendant could call and speak with her and the name and number of the director at E.R.'s residential center so he could inquire as to E.R.'s wellbeing. However, even though defendant received the letter, he did not secure an attorney, nor did he attempt to contact either E.R. or the director of the residential center.

After receiving Mr. Littlefield's March 11 letter, defendant testified that he went to an attorney in Missouri who advised him to call the legal aid services in Utah. Defendant apparently did just that, as evidenced by a May 12, 1994 letter from a Utah Legal Services' paralegal requesting information from defendant. This letter also informed defendant there was a separate case in the juvenile court for which defendant needed to "call Judge Valdez'[s] clerk immediately to request a court-appointed attorney." The letter gave defendant the juvenile court's number and apprised him of the upcoming May 26, 1994 review hearing. Despite being advised by both Mr. Littlefield and the Utah Legal Services' paralegal of the need to do so, defendant never called the juvenile court.

A Verified Petition for Termination of Parental Rights was filed with the juvenile court on September 22, 1994. The basis for the Petition against defendant was that he had abandoned E.R. pursuant to Utah Code

Ann. § 78–3a–407(1) (Supp.1995). Defendant was served with a summons to appear at a hearing set for November 22, 1994. On October 14, 1994, an attorney was appointed to represent defendant in the termination proceedings.

A trial was held on March 6 and 9, 1995. Defendant was represented by appointed counsel and testified via telephone, citing financial hardship as the reason for his absence.[10] On April 18, 1995, after reviewing trial briefs submitted by the parties, the trial court entered a Memorandum Decision. The trial court ordered defendant's parental rights terminated on the ground that defendant had abandoned E.R. pursuant to Utah Code Ann. §§ 78–3a–407(1), –408(1)(b) (Supp. 1995). Defendant appeals.

## ANALYSIS

Defendant challenges the trial court's findings and also argues there was insufficient evidence to support the trial court's determination of abandonment. Before we will overturn a trial court's factual finding, a defendant must first marshal all of the evidence supporting the challenged finding and then demonstrate that despite this evidence, the finding is against the clear weight of the evidence and is therefore clearly erroneous. *State ex rel. R.A.F.*, 863 P.2d 1331, 1333 (Utah App.1993); *State ex rel. M.S. v. Lochner*, 815 P.2d 1325, 1328 (Utah App.1991). We will not overturn a trial court's decision to terminate parental rights unless the findings are clearly erroneous. *State ex rel. T.E. v. S.E.*, 761 P.2d 956, 957

---

9. The testimony is somewhat confusing regarding whether Ms. Hayden received a copy of the letter defendant sent to Mr. Littlefield or received his letter before she wrote to him. Although Ms. Hayden testified that she never received either letter before she sent hers to defendant, only a copy of Mr. Littlefield's letter to defendant, she begins her letter to defendant by stating, "I received your letter and wanted to respond to you." Even though defendant had written to Ms. Hayden on March 25, 1994, Ms. Hayden testified that she did not receive this letter until *after* she had sent the April 26 letter. Thus, it is unclear what letter she is referring to in the opening sentence in the April 26 letter to defendant.

10. Although defendant alleges that it was inappropriate for the trial court to consider his failure to attend the trial due to his disability, the only mention of a disability during the trial was when defendant was asked about his health and he testified that he suffered a heart attack in April of 1993. The court specifically asked defendant, "[W]hy aren't you in Court today? Why aren't you in Salt Lake City fighting for your kid?" Defendant responded by saying "Now, at this time, your Honor, I ain't got no money and no way of getting down there." The court again asked, "Is that the reason, financial reasons?" Defendant stated, "For right now."

(Utah App.1988); *State ex rel. J.R.T. v. Timperly,* 750 P.2d 1234, 1236 (Utah App.1988).

### Factual Findings

■ Defendant essentially challenges only one of the trial court's factual findings.[11] Defendant claims the trial court erred in finding that "[f]rom September 1993, to January 1994 the father made no attempt to directly contact, communicate or manifest an interest in his daughter personally." The undisputed evidence demonstrates that as soon as defendant was provided with S.E.R.'s phone number in September of 1993, he called immediately and attempted to speak with E.R. Furthermore, defendant called E.R. again after he received S.E.R.'s September 23, 1993 letter, but was unable to speak with her because she was outside playing. It was uncontroverted that defendant sent cards and letters to E.R. after that phone call, all of which remained unanswered. Lastly, defendant sent E.R. a Christmas gift in January 1994. Thus, we agree with defendant that this finding is against the clear weight of the evidence and, therefore, should be reversed.

### Abandonment

■ Defendant also claims the trial court's determination terminating his parental rights was in error. A trial court may terminate parental rights if it finds that a parent has abandoned his or her child. Utah Code Ann. § 78–3a–407(1) (Supp.1995). We determine whether a child has been abandoned by undertaking a two-part test: "(1) whether the parent's conduct evidenced a conscious disregard for his [or her] parental obligations; and (2) whether that disregard led to the destruction of the parent-child relationship." *State ex rel. R.A.F.,* 863 P.2d at 1334. Prima facie evidence of abandonment includes a parent's "fail[ing] to communicate with the child by mail, telephone, or otherwise for six months or fail[ing] to have

11. Although there is additional discussion regarding the correctness of the evidence supporting the trial court's termination of defendant's parental rights, defendant does not articulate whether he is actually challenging a particular finding, nor does he recite the particular finding which he disputes. Based on the content of

shown the normal interest of a natural parent, without just cause." Utah Code Ann. § 78–3a–408(1)(b) (Supp.1995). The evidence supporting a finding of abandonment must be clear and convincing. *State ex rel. T.E.,* 761 P.2d at 958. Furthermore, " '[a]bandonment may be proven by either objective evidence of the parent's conduct or by the expressed, subjective intent of the parent.' " *Id.* (quoting *J.C.O. v. Anderson,* 734 P.2d 458, 462 (Utah 1987)); *accord Lochner,* 815 P.2d at 1329.

■ The court in the case at bar concluded that defendant "has failed to communicate with [E.R.] by mail, telephone or otherwise for more than six months and has not show[n] the normal interest of a natural parent without 'just cause.' " In support of this determination, the trial court found defendant's testimony that S.E.R. " 'hid' " E.R. from their separation in 1987 until 1993 lacking in credibility. Furthermore, defendant failed to contact E.R. once he knew she was in the state's custody and had the number to contact her. The court went on to state:

> Knowing the child was in foster care since January 1994 he has not followed the advice of attorneys and the caseworker to call the child, court or therapist to communicate and become actively involved in the child's life. He has never appeared at the scheduled hearings which he had legal notice. He has had no contact with his daughter for the entire time she has been in foster care. The child has no relationship whatsoever with the father, having talked to him only once for 4½ seconds since 1987. The financial support of the father consists of forced garnished wages and possible social security benefits. The fathers [sic] cooperation in filling out forms and questionnaires regarding his daughter amounts to token efforts to comply with agency requests rather than provide his daughter with the necessities of life.

defendant's analysis, we are unable to decipher the precise nature of defendant's other challenges, if any. Therefore, we will treat the balance of defendant's analysis as a sufficiency of the evidence argument supporting the termination.

Thus, we must determine whether the above is sufficient to support a finding of abandonment.

A case similar to the case at hand is *State ex rel. Orgill,* 636 P.2d 1075 (Utah 1981). In *Orgill,* although the mother's parental rights had been terminated by the juvenile court, this determination was reversed by the Utah Supreme Court based on insufficient evidence to support a finding of abandonment. The mother subsequently filed a petition to have the custody of her children restored to her. *Id.* at 1076. After the petition was filed, the mother received a letter from the Utah Division of Family Services which gave her information on re-establishing the parent-child relationship and also gave her the name and number of a contact person to aid her in her pursuit. However, the mother never contacted that person. Even though she was aware of the date and time, the mother did not attend the hearing on the petition either in person or through counsel and justified her absence by claiming she felt it best to leave the children with the foster parents. The court dismissed the petition and the mother made no subsequent attempt to contact the court or the children in an attempt to establish a relationship with her children. *Id.*

Approximately a year later the foster parents filed a petition to terminate the mother's parental rights. The mother attended the hearing and objected to the termination. Even so, the court granted the petition on the grounds of abandonment and unfitness. *Id.* at 1077. On appeal, the supreme court discussed the issue of abandonment and applied the same two-part test which we have set out above. In affirming the juvenile court's finding of abandonment, the supreme court highlighted the fact that the mother never followed through on her petition for restoration of custody and her other efforts were minimal, including only two letters written to the Division of Family Services inquiring as to the well-being of her children and a Christmas present she sent to the children. *Id.* The court stated that the mother had "an obligation ... to vigorously pursue the fruits" of the case. *Id.* The supreme court dismissed her excuse that her counsel withdrew from the case by stating "ordinary ef-

fort on her part could have quickly solved that problem." *Id.*

As in *Orgill,* defendant in the instant case has also neglected to follow through on his meager attempts to obtain custody of E.R. Defendant corresponded only three times over a five month period; once with the Guardian Ad Litem, once with the social worker, and once with a paralegal at Utah Legal Services. Although the Guardian Ad Litem advised defendant to contact an attorney and provided him with the necessary numbers, defendant failed to do so. Additionally, even though the social worker gave defendant E.R.'s number so that he could call and talk to her, he again failed to do so. Thus, the last contact defendant had with E.R. was in the first part of January 1994 when he sent her a Christmas present.

Furthermore, although defendant contacted Utah Legal Services, he apparently never followed through because he did not have an attorney representing his interests until the juvenile court appointed him one in October of 1994. The paralegal also strongly advised defendant to contact the juvenile court "immediately" so that counsel could be appointed for him in those proceedings. Again, defendant failed to do so. The contact with the paralegal in May of 1994 was the last effort by defendant to try to procure custody of E.R. A parent's "failure ... to communicate in any way with DFS or the juvenile court regarding ... termination proceeding[s] ... belie[s] any firm intention on [the parent's] part to resume custody." *Lochner,* 815 P.2d at 1329.

Defendant attempts to justify his failure to actively pursue the case based on the fact that he could not afford a phone. However, this excuse lacks merit; defendant had use of a phone twice when he initially called S.E.R. in September or October of 1993. Defendant also claims that he never called E.R. because she had the mentality of a two- to four-year-old. The record establishes that although she was eight, E.R. had the mentality of a four-year-old, not a two-year-old. Defendant has cited no authority or provided any evidence establishing that a four-year-old cannot talk on the phone. Furthermore, after

sending the gift in January 1994 and after he knew how to contact her, defendant never sent cards or gifts to E.R. to let her know that she had a father who was interested in establishing a parent/child relationship with her. As in *Orgill,* defendant had "an obligation . . . to vigorously pursue the fruits" of his parental rights, but failed to do so. 636 P.2d at 1077.

It is well established under Utah law that a finding of abandonment will be upheld "based solely on a parent's lack of visitation and communication." *See State ex rel. R.A.F.,* 863 P.2d at 1334, and cases cited therein. A lack of visitation and communication with a party's child or children evidences a conscious disregard of parental obligations, which leads "to the destruction of the parent-child relationship." *Id.* Accordingly, the above facts constitute prima facie evidence that defendant failed to communicate with

E.R. for six months and failed to show "the normal interest of a natural parent, without just cause." Utah Code Ann. § 78–3a–408(1)(b) (Supp.1995). Because defendant has been unable to rebut the prima facie evidence of abandonment,[12] we conclude that the evidence supports the trial court's finding of abandonment.[13]

The trial court's finding of abandonment is affirmed.[14]

BILLINGS and GREENWOOD, JJ., concur.

---

**12.** Defendant might have been able to rebut the prima facie evidence against him if his financial condition and/or poor health had in fact prevented him from attempting to regain custody of his daughter. However, insufficient testimony was elicited from the defendant to establish these facts.

**13.** Defendant suggested at oral argument that the State had some sort of obligation to assist him in these proceedings. The State had no duty at the time this case was heard by the trial court to consider a noncustodial parent before termination proceedings based on abandonment were concluded, *see State ex rel. J.R.T. v. Timperly,* 750 P.2d 1234, 1237–38 (Utah App.1988). The State is now required to first consider a noncustodial parent when a child is removed from the custodial parent's home. *See* Utah Code Ann. 78–3a–

307 (Supp.1995). Furthermore, if the State files a petition to have a neglected or abused child removed from his or her parent's home, notice must be given to the noncustodial parent. *See id.* § 78–3a–309(1)(b). Of course, in the instant case, the noncustodial parent was not only considered, but was one of the subjects of the proceeding.

**14.** Defendant claims that "the trial court erred as a matter of law by making negative Findings of Fact due to [his] physical disability." However, the only reference made by the trial court in its findings was with respect to defendant's financial inability to attend the court proceedings, not his physical disability. Thus, we find this argument to be without merit and decline to address it. *See State v. Allen,* 839 P.2d 291, 303 (Utah 1992).