Orin John Wulffenstein appeals from a decree of the Juvenile Court terminating his parental rights to two little girls, Tammy and Tina. The girls were born in June 1970 and July 1971, and are the natural children of appellant. The parents were deprived of the temporary custody and guardianship of the children in March of 1972. On May 9, 1975, pursuant to hearing, the decree of termination was entered. We affirm. All statutory references are to U.C.A. 1953.
The Juvenile Court found the father unfit or incompetent, by reason of conduct or conditions seriously detrimental to the children, viz., he was emotionally unstable and could not provide the security, stability, and modeling necessary for the children. The findings stated the father had a long history of aggressive criminal behavior; he was incarcerated in the Utah State Prison; and had once escaped from the prison.
The Juvenile Court further found the father had abandoned the children in that (a) he had not provided financial support for them; (b) he had had little or no contact with them since their birth; (c) he had not manifested any intention to resume custody of them; (d) his present whereabouts were unknown. The court also found the rights of the mother had been terminated on June 26, 1974, and she was dead, at the time of the hearing.
On appeal, the father contends there was insufficient evidence to support the findings of unfitness and abandonment. He further urges the court abused its discretion by denying his motion to vacate the decree and permit the introduction of additional evidence.
55-10-109(1), as enacted 1965, provides the court may decree termination of parental rights if the court finds:
 (b) That the parent or parents have abandoned the child. It shall be prima *Page 333 
facie evidence of abandonment that the parent or parents, although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following such surrender have not manifested to the child or to the person having the physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child, . . . .
The second sentence of subsection (b) applies only to parents with "legal custody" which is defined in 55-10-64(7), and the parents herein had been deprived of custody as defined in 55-10-64(13). Thus there are no guidelines or definition of the term "abandoned" under the Juvenile Court Act of 1965.
Appellant urges that "abandoned" should be interpreted and applied under 55-10-109(1)(b) as the term "desert" has been applied under the adoption statute, Sec. 78-30-4, U.C.A. 1953. He cites In re Jamesons Adoption,[1] wherein this court ruled "desertion" meant an intentional abandonment of the child rather than a separation due to misfortune or misconduct.
Appellant further relies on In Re Adoption of Walton,[2]
where this court stated:
 . . . To sever the relationship successfully, one must have abandoned the child, and such abandonment must be with a specific intent so to do, — an intent to sever all correlative rights and duties incident to the relationship. Such intent must be proved by him who asserts it . . . "by clear and indubitable evidence."[3]
In expanding on this concept this court explained:
 Perhaps this court has traveled as far as any in giving expression to the type of abandonment intended to exist in order to sever parental ties when we said in a custody case, that
 "abandonment, in such cases, ordinarily means that the parent has placed the child on some doorstep or left it in some convenient place in the hope that someone will find it and take charge of it, or has abandoned it entirely to chance or fate."[4]
Citing the aforementioned standard, appellant contends the facts found are insufficient to sustain a finding of abandonment. Although we have not specifically defined abandonment under the Juvenile Court Act of 1965, we have set forth evidence which sustained such a finding in State in the Interest of A.[5]
There, this court noted the children had spent a great part of their lives away from their mother, who had shown very little interest in them for two and one-half years. The effort she put forth to visit the children was nil. Her failure to manifest an interest in them after losing custody, and to manifest a firm intention to resume physical custody of her children for over a period of two years was held sufficient to sustain a finding of abandonment under 55-10-109(1)(b).
In D.M. v. State,[6] a termination proceeding, the appellant, as here, urged a traditional definition of abandonment, that it imports conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. The standard urged would require proof of an intent by the parent to relinquish all claim to a natural child in order to dissolve the normal legal relationship. In contrast, the State urged an objective standard, viz., appellant's intent was properly inferred from the realities of her conduct rather than from mere oral protestation.
We quote with approval the well-stated explanation of the principle. *Page 334 
 Whether or not there has been an abandonment within the meaning of the statute is to be determined objectively, taking into account not only the verbal expressions of the natural parents but their conduct as parents as well. The subjective intent standard often focuses too much attention on the parent's wishful thoughts and hopes for the child and too little on the more important element of how well the parents have discharged their parental responsibility. . . .
 While it may well be that a subjective intent is determinative when dealing with abandonment of personal property, over which the owner exercises an absolute property right, we believe that the relationship between parent and child mandates an objective standard of abandonment which looks to the parent's obligations and rights as well as to whether the natural bonds of love and affection between parent and child have been effectively dissolved by reason of parental conduct.
 A better definition of abandonment, for these purposes, is that abandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship.[7]
The court cited as evidence to sustain the finding of abandonment, the mother's failure to visit or communicate with the child for several years, her failure to support the child in any way either emotionally or financially, together with the long term commitment of the child to a foster home. The court concluded that time and human nature had operated to dissolve the normal bonds between the child and his natural mother.
The aforecited objective test was refined in In Re B.J.,[8]
wherein the court said the test focuses on two questions — has the parent's conduct evidenced a conscious disregard for his parental obligations, and has that disregard led to the destruction of the parent-child relationship?
In this matter, appellant was incarcerated at the Utah State Prison in February, 1971. He was released on May 15, 1973. He had two one-hour visits with his daughters during June and July of 1973. On July 26, 1973, he was incarcerated in the county jail, where he remained until he was transferred to the prison in August 1974. He was given a conditional release from prison to participate in a drug treatment program at the Odyssey House, from which he disappeared on October 23, 1974. Upon a report of his disappearance, a warrant for his arrest was issued. At the time of the termination proceedings, appellant's whereabouts were unknown. However, he was ably represented by counsel. He was returned to the prison, after he was located, on May 10, 1975. During the time appellant was in the county jail, he represented to a social worker that he would voluntarily relinquish the children, if he were returned to prison. The children have been under foster care most of their lives. During this time the father's conduct has indicated a minimal interest in their welfare. He has demonstrated an inability to acquire a suitable home for them or to proffer a realistic plan to create a family unit, wherein he can sustain and nurture the parent-child relationship.
The record sustains a finding that the father's conduct demonstrated a conscious disregard of the obligations owed by a parent to a child, leading to the destruction of the parent-child relationship — an abandonment. Since the record sustains an abandonment, the issues involving his unfitness need not be reviewed.
Appellant further contends the court's refusal to vacate the decree and permit him to present further evidence constituted an abuse of discretion. The Juvenile Court conducted three hearings prior to rendering the decree. There was evidence that during the time appellant's location was unknown, he did contact his counsel, but he *Page 335 
did not appear for the hearings. The affidavit submitted with the motion recites evidence concerning his wishful thoughts and hopes for the children and not evidence of how well he had discharged his parental responsibilities.
Although the courts incline towards granting relief to a party, who has not had the opportunity to present his case, this standard is applied at the trial court level. For this court to deem the refusal of the lower court to vacate a valid judgment an abuse of discretion, public policy demands more than a mere statement that a person did not have his day in court when full opportunity for a fair hearing was afforded to him.
 The movant must show that he has used due diligence and that he was prevented from appearing by circumstances over which he had no control.[9]
Since appellant's absence was a circumstance of his own volition, the Juvenile Court's determination was not an abuse of discretion.
ELLETT, CROCKETT and WILKINS, JJ., concur.
HENRIOD, C.J., does not participate herein.
[1] 20 Utah 2d 53, 432 P.2d 881 (1967).
[2] 123 Utah 380, 259 P.2d 881 (1953).
[3] at pp. 382-383 of 123 Utah, at p. 883 of 259 P.2d.
[4] at p. 384 of 123 Utah, at p. 883 of 259 P.2d.
[5] 30 Utah 2d 131, 514 P.2d 797 (1973).
[6] Alaska, 515 P.2d 1234 (1973).
[7] at pp. 1236-1237 of 515 P.2d.
[8] Alaska, 530 P.2d 747, 749 (1975).
[9] Airkem Intermountain, Inc. v. Parker, 30 Utah 2d 65, 68,513 P.2d 429 (1973).