940 P.2d 1229 (1997)
STATE of Utah, in the Interest of M.C. aka M.M., and K.S. aka K.C., persons under eighteen years of age.
M.C. and K.S., by and through their Guardians Ad Litem, Appellants,
v.
K.H.C., Appellee.
No. 960412-CA.
Court of Appeals of Utah.
June 26, 1997.
*1230 Martin N. Olsen and Elizabeth M. Knight, Office of the Guardian Ad Litem, Salt Lake City, for Appellants.
Julie George McPherson, Laherty & Associates, Salt Lake City, for Appellee.
Before BENCH, JACKSON and ORME, JJ.
ORME, Judge:
The children, by and through their guardians ad litem, appeal a juvenile court order denying their petition to terminate the parental rights of their mother. The guardians argue that the facts established at trial require termination of the mother's rights on grounds of unfitness, abuse and neglect, and "token efforts," pursuant to Utah Code Ann. § 78-3a-407(2), (3), and (6) (1996), respectively. We remand for further consideration.

FACTS
"`Because the termination of parental rights is fact sensitive, we review the facts of the controversy in detail.'" In re J.P., 921 *1231 P.2d 1012, 1014 (Utah.Ct.App.1996) (quoting State ex rel. C.Y. v. Yates, 765 P.2d 251, 252 (Utah.Ct.App.1988)), cert. denied, 931 P.2d 146 (Utah 1997).
K.C. is the mother of L.C., born December 23, 1980; K.S., born July 16, 1990; and M.C., born October 15, 1993. On November 3, 1995, the guardians for K.S. and M.C. petitioned the juvenile court to terminate the mother's parental rights.[1] The petition alleged several grounds for termination, including abuse and neglect of K.S. and M.C., pursuant to Utah Code Ann. § 78-3a-407(2) (1996); unfitness and incompetence, pursuant to Utah Code Ann. § 78-3a-407(3) (1996); and "token efforts," pursuant to Utah Code Ann. § 78-3a-407(6) (1996). These allegations were tried before the juvenile court on March 5, 6, and 7, 1996.
In support of their allegations of abuse and neglect, the guardians presented testimony regarding two incidents involving K.S. and her mother. The first incident occurred in December 1992, when her mother left K.S., who was one year old at the time, unattended in an unheated truck. Testimony indicated that K.S. was not wearing gloves, a coat, or a hat, and that the child was "very cold" and her hands were "very cold."
The second incident occurred on September 5, 1994, when her mother beat K.S. so severely that it left distinct marks and bruises on K.S.'s chin, neck, legs, and face. This incident subsequently led to a guilty plea by the mother on assault charges.
Both incidents were undisputed at trial. In addressing these two incidents, the trial court made the following two findings:
These incidents, of neglect and abuse, although reprehensible, are not of a sufficient emotionally or physically disabling nature in and of themselves to justify termination of [the mother]'s parental rights.
It is impossible, and improper, to apply one inflexible or formalistic measure to assess the degree of abuse or neglect which a child must endure before termination of parental rights is warranted. Utah Law provides some guidance, however scant, concerning this issue in Utah Code Ann. § 78-3a-408(2)(i), which states that a single incident of life threatening or gravely disabling injury to or disfiguring of the child makes the court determination of unfitness or neglect. [sic] Neither the 1992 incident of neglect or the 1994 incident of abuse rose [to the] level of this magnitude, and although two incidents occurred here, based on the statutory guidance such as it is and the exercise of my own conscience[,] I conclude that termination in this setting is inappropriate.
To support their "token efforts" allegation against the mother, the guardians presented evidence of the mother's incarceration for the assault on K.S. and the resulting court orders barring her from contacting the children.[2] In this regard, the trial court found that the mother was excused from maintaining contact with both K.S. and M.C. "because she was court ordered to have no contact either with her children or the adults who had custody of them."
To establish the mother's unfitness as a parent, the guardians presented evidence of her habitual and excessive use of alcohol and drugs, her emotional and mental condition, and her history of violent behavior. Three witnesses testified at trial concerning her drug and alcohol abuse. One witness, the paternal grandmother of M.C., testified that *1232 she noticed the odor of alcohol on the mother's breath several times and had observed her in an intoxicated state. The father of K.S. testified that in 1991, the mother was using alcohol and drugs and failed to maintain a clean house. He described the house as "messy." A third witness, the mother's sister, testified that the mother told her she used "crank" sometime during the middle of 1995. However, the sister also stated that, at least so far as she was aware, the mother had not used drugs or alcohol when she had custody of her children.
Evidence of the mother's alleged mental or emotional illness came from a psychologist retained by the guardians. He testified that the mother had "histrionic personality patterns." Such people, according to the psychologist, tend to be "highly emotional, very dependent on external approval, external direction, [and] external guidance," and "base many of their decisions on ... emotion rather than ... intellect." He stated that her personality pattern indicated a tendency "to have episodic outbursts of emotion which may run the gamut from sadness to anger to frustration to rage." He characterized people with "histrionic personality patterns" as often being "emotionally volatile and labile[, i.e., unstable]." When asked whether this impacted negatively on the mother's ability to parent her children, the psychologist stated:
That impacts parenting in that I think to be a functional or adequate parent, one needs to understand the longitudinal impact of one's behavior. So that means the ability to predict that if I do this with my child, this will occur. And to be consistent with that and not make decisions or disciplinary strategies based on emotion, but more on intellect.
This was the only evidence regarding the mother's alleged mental and emotional illness. In its findings, the trial court stated that an emotional or mental illness must be subject to diagnosis before it may act as an indicator of unfitness. Since no such diagnosis was ever made by the witness, the trial court stated that there was no "requisite showing of unfitness based on emotional [or mental] illness."
In addressing the mother's violent behavior, and its relation to the allegation of unfitness, the trial court acknowledged that "[t]he record contains ample evidence to support the conclusion that [the mother] has committed violent acts during her adult life." However, in the trial court's view, these acts, when considered together, do not "create the portrait of the violent person which the legislature envisioned when it enacted the [Termination of Parental Rights Act]." Thus, the trial court found that the acts of violence toward the children were "not of sufficient quantity or quality to warrant the termination of [the mother]'s parental rights."
Although there was evidence regarding the mother's violent behavior and inability to provide adequately for her children, the court specifically found that her ability to care for and support her children was amply supported by the testimony of other, more "objective observers." In this regard, the trial court found as follows:
Margo Johnson, a very experienced DFS worker, observed [the mother] appropriately caring for her children during 1991. Cyndy Johnson, a DFS transportation worker, indicated she saw no inappropriate conduct between [the mother] and her children during the three to six month period in 1990-1991 during which she supervised visits between [the mother] and her children. Max Park, a DFS family preservation worker who extensively investigated the home, determined that [the mother] was adequately caring for her children during the period of August-November 1991. Garth Andrus, a Division of Family Services worker, testified that he had received positive reports about [the mother]'s parenting abilities from Gus Pannos, a DFS worker now deceased, and that Mr. Andrus successfully closed [the mother]'s voluntary supervision case in January, 1993. Jim Gould, a DFS child protection investigator, observed appropriate care and environment as of May 1994.
In its conclusions of law, the trial court stated that the guardians had failed to prove by clear and convincing evidence that any of the incidents of drug or alcohol abuse, physical abuse and neglect, or mental or emotional *1233 illness rose to the degree which would support the termination of the mother's parental rights. This appeal followed.

ISSUES ON APPEAL
The guardians have raised several issues on appeal.[3] Although couched in somewhat different terms by the parties, the pivotal issues in this case are essentially as follows: (1) whether a parent's failure to maintain contact with her children is justified when such failure is caused by the involuntary confinement of the parent and (2) whether a single incident of serious abuse is enough under the Termination of Parental Rights Act to entitle a child to have the parent's rights terminated at the petition of his or her guardian ad litem.

STANDARD OF REVIEW
"`We review questions of statutory interpretation for correctness giving no deference to the trial court's interpretation.'" In re R.N.J., 908 P.2d 345, 349 (Utah.Ct.App. 1995) (quoting Wells v. Wells, 871 P.2d 1036, 1038 (Utah.Ct.App.1994)).

TOKEN EFFORTS TO COMMUNICATE AND SUPPORT
We first decide whether, under Utah Code Ann. § 78-3a-407 (1996),[4] a parent is excused from making meaningful efforts to contact or support her children when the parent's failure to maintain contact is caused by her involuntary confinement. The guardians argue that the trial court erred in finding that the mother did not voluntarily fail to provide more than just token efforts to support or communicate with her children. The thrust of the guardians' argument is that the mother committed voluntary criminal acts which placed her in jail and caused the removal of her children. The mother counters with the argument that her failure to communicate with and support her children should be excused, not only by the fact that she was involuntarily incarcerated for a time, but also by the fact that various court orders prohibited her from having any contact with her children. The guardians reply that the "no-contact" orders would not have been necessary had it not been for the mother's "voluntary" acts of abusing her children.
The effect of involuntary incarceration on parental rights has been examined to a limited degree by the Utah Supreme Court in the context of abandonment and termination proceedings. In State ex rel. Summers Children v. Wulffenstein, 560 P.2d 331 (Utah 1977), a father's parental rights were terminated on the ground he abandoned his children. The father had served approximately two years in the Utah State Prison. In addition, however, the father visited his children only twice upon his release from prison. The father also disappeared for a time from a drug rehabilitation program after his release, and his whereabouts were unknown at the *1234 time of the termination proceedings. There was also evidence that the father would voluntarily relinquish his rights to his children if he were ever returned to prison. Consequently, the Court found that the father's conduct "indicated a minimal interest in [his children's] welfare" and that he had "demonstrated an inability to acquire a suitable home for them or to proffer a realistic plan to create a family unit, wherein he can sustain and nurture the parent-child relationship." Id. at 334.
The Wulffenstein court did not address the specific issue before this court, namely, whether incarceration of a parent legally excuses the parental duties of contact with, and support of, that parent's children. However, the case provides some indication that more than incarceration alone is needed to justify the termination of a parent's rights on grounds of abandonment. Indeed, rather than dwelling on the father's incarceration, the Court concentrated on the father's conduct once he was released from prison to determine whether it implied "`a conscious disregard of parental obligations leading to the destruction of the parent-child relationship.'" Id. (quoting D.M. v. State, 515 P.2d 1234, 1236-37 (Alaska 1973)).
The effect of incarceration on a parent's rights was examined by this court in State ex rel. M.W.H. v. Aguilar, 794 P.2d 27 (Utah.Ct. App.1990). In that case, a father engaged in criminal conduct that resulted in his incarceration. In upholding the trial court's order terminating the father's rights on grounds of abandonment, this court acknowledged that "criminal conduct in and of itself is not a sufficient ground on which to terminate parental rights." Id. at 29. However, similar to the Wulffenstein court, this court in Aguilar focused on other aspects of the father's conduct which demonstrated the father's conscious disregard of his parental obligations, including the fact that, during his time in prison, he did not attempt to contact his child in spite of his apparent ability to do so, at least via letters and telephone calls. See id.
A careful reading of Aguilar reveals that the involuntary confinement of a parent on criminal charges, although not a sufficient ground, by itself, to justify termination of that parent's rights, is also not a complete excuse for the parent's failure to communicate with his or her children. See id. Prisoners have at least limited opportunities to write and, sometimes, to telephone. However, where confinement does preclude communication with children, the failure to communicate is properly considered nonwillful. See generally Peyla v. Martin, 40 Ill.App.3d 373, 352 N.E.2d 407, 410-11 (1976) (concluding that parole officer's instruction to parolee-parent not to seek visitation with children and refusal to grant parolee-parent's request for travel permits precluded finding of parent's willful failure to maintain interest in child); In re Adoption of Herman, 406 N.E.2d 277, 280 (Ind.Ct.App.1980) (noting "it must be determined whether [the parent], though incarcerated, still maintained the ability to communicate with the minor child").
The effect of incarceration on parental rights has also been examined in the analogous context of adoption proceedings in which parental consent to an adoption is at issue. The general rule emerging from these cases is that neglect of parental duties caused by imprisonment is not necessarily willful conduct and therefore does not inevitably result in the loss of a parent's right to consent to an adoption. See, e.g., In re Adoption of Jameson, 20 Utah 2d 53, 54-55, 432 P.2d 881, 882 (1967).
In Jameson, the Utah Supreme Court considered whether a parent's involuntary confinement for an indeterminate period of time constituted desertion, thereby excusing the confined parent's consent to an adoption. In construing the term "desert" as used in Utah's adoption statute in effect at the time, the Supreme Court stated that such term means "an intentional abandonment of the child rather than a separation due to misfortune or misconduct." Id. at 54-55, 432 P.2d at 882. Thus, similar to Wulffenstein, the Court, impliedly held that incarceration alone does not constitute willful and intentional conduct of the parent and that more must be shown in order to prove parental desertion of a child.
Other authorities have come to the same conclusion as the Utah Supreme Court did in Jameson, holding that the imprisonment of a *1235 parent is not willful conduct and, therefore, does not inevitably result in the loss of that parent's right to consent to an adoption. See, e.g., R.N.T. v. J.R.G., 666 P.2d 1036, 1039 (Alaska 1983); Harden v. Thomas, 329 So.2d 389, 390-91 (Fla.Dist.Ct.App.1976); Murphy v. Vanderver, 169 Ind.App. 528, 349 N.E.2d 202, 203 (1976); In re Adoption of McCray, 460 Pa. 210, 331 A.2d 652, 655 (Pa. 1975); Elliott v. Maddox, 510 S.W.2d 105, 107 (Tex.Civ.App.1974). See also In re Adoption of Rapp, 348 So.2d 107, 109 (La.Ct. App.1977) (concluding father's imprisonment is just cause for his failure to comply with child support obligation); State v. Grady, 231 Or. 65, 371 P.2d 68, 69-70 (1962) (employing adoption precedent, court holds mother's incarceration insufficient to prove parental unfitness).
A similar rule exists in cases in which a state agency has denied parental access to children and then claimed the parent was unfit because of abandonment or for failure to maintain an interest in the child. See, e.g., In re Taylor, 30 Ill.App.3d 906, 334 N.E.2d 194 (1975). In Taylor, the court stated:
It appears to us that these cases stand for the proposition that, where official acts prevent a parent from maintaining contact with a child, unfitness under the Adoption Act cannot be proven by such lack of contact standing alone.... We do not believe that the Department should be permitted to prevent a parent from contacting her children and then claim that the parent is unfit solely because she did not do so.
Id. 334 N.E.2d at 197.
We apply similar logic to the facts in the instant case in holding that involuntary confinement of a parent excuses that parent from maintaining contact with his or her children, but only to the extent the parent is precluded, by directive or by circumstances, from maintaining contact during the period of incarceration. Although the acts leading to her incarceration were voluntary, the mother's resulting incarceration does not represent willful conduct justifying termination of her parental rights. While the record does not disclose what opportunities would otherwise have been available to write or telephone the children while she was incarcerated,[5] the mother was expressly precluded by court order from contacting her children, or any adults having custody of her children, during the one-year period culminating in the trial herein. See note 2, supra. Therefore, her failure to maintain contact with her children is not voluntary for purposes of the statute.

ABUSE OF K.S.
We next determine whether a single incident of serious abuse of a child is sufficient to entitle that child to have his or her parent's rights terminated on the guardian ad litem's petition. Stated another way, we must decide whether a trial court is required to terminate parental rights once there is a finding of at least one serious incident of physical abuse.
At issue in this case is Utah Code Ann. § 78-3a-407 (1996). At the time of trial, as now, this statute provided, in pertinent part, as follows:
The court may terminate all parental rights with respect to one or both parents if it finds any one of the following:
. . .
(2) that the parent or parents have neglected or abused the child;
(3) that the parent or parents are unfit or incompetent....
Utah Code Ann. § 78-3a-407 (1996) (emphasis added).
Also at issue is Utah Code Ann. § 78-3a-408 (Supp.1995), which treats the evidence relevant to termination of parental rights. Pertinent to this case is subsection (2) of section 78-3a-408. At the time of trial, that subsection provided, in pertinent part, as follows:
(2) In determining whether a parent or parents are unfit or have neglected a child the court shall consider, but is not limited to, the following conditions:

*1236 . . .
(b) conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature;
. . .
(i) a single incident of life-threatening or gravely disabling injury to or disfigurement of the child.
Utah Code Ann. § 78-3a-408(2) (Supp.1995) (emphasis added).[6]
We turn to well-established maxims of statutory construction in determining whether these sections impose a mandatory duty on the trial court to terminate once certain conditions are found or whether the provisions at issue are merely directory. First, it is well established that "[w]here the language of a statute is clear and unambiguous, [we] may hold that the construction intended by the legislature is obvious from the language used." 3 Norman J. Singer, Sutherland Statutory Construction § 57.03, at 7 (5th ed.1992). Accord Brinkerhoff v. Forsyth, 779 P.2d 685, 686 (Utah 1989); State v. Singh, 819 P.2d 356, 359 (Utah.Ct.App.1991), cert. denied, 832 P.2d 476 (Utah 1992). It is presumed that "words are used in their ordinary sense." In re Adoption of M.L.T., 746 P.2d 1179, 1180 (Utah.Ct.App.1987). It is also well established that "[t]he form of the verb used in a statute, i.e., something `may,' `shall' or `must' be done, is the single most important textual consideration determining whether a statute is mandatory or directory." 3 Norman J. Singer, Sutherland Statutory Construction § 57.03, at 7 (5th ed.1992).
"According to its ordinary construction, the term `may' means permissive, and it should receive that interpretation unless such a construction would be obviously repugnant to the intention of the Legislature or would lead to some other inconvenience or absurdity." Crockett v. Crockett, 836 P.2d 818, 820 (Utah.Ct.App.1992). The term "shall," on the other hand, "is usually presumed mandatory and has been interpreted as such previously in this and other jurisdictions." Board of Educ. v. Salt Lake County, 659 P.2d 1030, 1035 (Utah 1983). See also Herr v. Salt Lake County, 525 P.2d 728, 729 (Utah 1974) ("The meaning of the word shall is ordinarily that of command.").
The confusion in this case is due to the use of "may" in the introductory language of section 78-3a-407 and the use of the term "shall" in subsection (2) of the applicable version of section 78-3a-408. The confusion is mitigated, however, when the two sections are harmonized. Applying the ordinary construction of "may" to section 78-3a-407, it is clear that termination is never automatic and that a trial court is granted discretion in deciding the all-important question of whether to terminate a parent's rights. However, in deciding whether a parent is unfit or has neglected a child so as to warrant termination, the trial court is bound to consider the factors and conditions set forth in subsection (2) of section 78-3a-408. Although it is mandatory for the trial court to consider evidence of circumstances under subsection (2), this mandate does not abrogate the trial court's ultimate responsibility to either deny or grant a petition for termination. Indeed, there is nothing in sections 78-3a-407 or -408, or any other provision of applicable law which has been called to our attention, that requires the trial court to terminate if it finds that such conditions exist.
Of course, it does not follow that the trial court has unbridled discretion in granting or denying a petition for termination. Once the trial court has found, as it did in this case, that there has been an incident of serious child abuse, it is incumbent upon the trial court to enter sufficiently detailed findings of fact explaining why a parent's rights are nonetheless to be preserved. See generally In re S.T., 928 P.2d 393, 398 (Utah.Ct.App.1996). In cases involving the abuse and neglect of children, trial courts should go to extra lengths to enter detailed findings of fact, especially in cases where the decision has been made not to terminate the parental rights in the face of evidence of parental abuse. Only then can *1237 we, as an appellate tribunal, review whether discretion was properly exercised.
In this case, the trial court's factual findings are insufficient for us to conduct a meaningful review of the trial court's exercise of discretion. The findings relating to the abuse and neglect of K.S. consist of four double-spaced paragraphs, taking up less than one full page. In those findings, the court acknowledged the fact that K.S. was left unattended in December 1992 in an unheated truck and that K.S., when she was all of two years old, was severely beaten by her mother to the point that she suffered abrasions and bruises on both her head and neck. Notwithstanding its characterization of this conduct as "reprehensible," the trial court determined that these incidents of abuse and neglect were "not of a sufficient emotionally or physically disabling nature in and of themselves to justify termination of [the mother]'s parental rights."
The guardians argue that this standard, if upheld on appeal, would be detrimental to abused and neglected children throughout the state, since it would require an abusive episode or incident to be "disabling" before the offender's parental rights could be terminated. The guardians' argument is well-taken. Instead of relying on its largely unexplained feelings of "conscience" that the abuse in this case was not sufficient to justify termination, the trial court should have entered factually-based findings supporting its conclusion that termination was not warranted. Perhaps the beating occurred as a result of emotional or environmental factors not likely to recur. Perhaps the mother has benefitted from anger management or parenting classes or otherwise been rehabilitated. Perhaps she now has available to her sources of support not available at the time of the beating, whether from family, friends, counselors, or otherwise. Perhaps the beating and truck episodes were complete aberrations in a history of otherwise commendable parenting. Whatever underlies the trial court's subjective sense needs to be shared in some detail so that it can be considered by this court incident to our responsibility to review whether discretion has been exercised properly.[7]
In light of the Legislature's recent enactment of certain provisions of the Child Welfare Reform Act, the trial court's obligation to enter sufficiently detailed findings of fact may be even more important now than in the past. See Child Welfare Reform Act, ch. 260, § 29, 1994 Utah Laws 1142, 1155-56 (codified at Utah Code Ann. § 62A-4a-201 (1997)). The Act acknowledges that a fit and competent parent has a constitutional right to parent his or her own children. See Utah Code Ann. § 62A-4a-201(1) (1997). However, when that parent is unable or unwilling to render safe and proper parental care and protection, the child's welfare is the consideration of paramount importance. See id. § 62A-4a-201(2). The Act requires the State to take into account an abused child's need for protection from immediate harm and also the emotional impact of separating the child from his or her family. See id. § 62A-4a-201(3). In short, the Act establishes the State's policy when abused and neglected children are involved in termination cases: The child's welfare and best interest of paramount importance, not the parent's rights.
Given this policy of the Child Welfare Reform Act, on remand the trial court must take into consideration the protection of K.S. and M.C. Nothing in its findings deals with the welfare and best interest of K.S. and M.C. and whether the children need protection from their mother. The findings focus *1238 all but exclusively on the parent and her culpability.

CONCLUSION
We hold that a parent is excused from maintaining contact with his or her children when the failure to maintain contact is caused by the involuntary confinement of the parent and the parent is precluded from contacting the children during such confinement. Even after a finding of serious physical abuse has been made, the trial court still has discretion in deciding whether to grant or deny a petition for termination. Such discretion must be properly exercised. The factual findings in this case are insufficient to enable us to meaningfully review the trial court's exercise of discretion. Therefore, we vacate the order appealed from and remand for the entry of adequately detailed findings.[8]
BENCH and JACKSON, JJ., concur.
NOTES
[1] A prior petition for termination, filed in April 1995, requested termination for all three children, including the eldest child, L.C. The petition filed in November 1995 was an amended petition, pertaining only to the two younger children, K.S. and M.C.
[2] The "no-contact" orders were not imposed against the mother until April 1995, several months after the September 1994 beating of K.S. Although not completely clear from the record, it appears that the "no-contact" orders applied to both M.C. and K.S., and not just to K.S. Thus, from April 1995 until the time of trial, the "no-contact" orders were in place and prevented the mother from having contact with any of her children. During that time, the mother was in and out of jail for various reasons, including the assault on K.S. and her failure to attend various court hearings. It also appears from the record that once the mother was released from jail for the assault conviction in the summer of 1995, she violated the terms of her eighteen-month probation in December 1995 and was sent back to jail from December 1995 until January 1996.
[3] The guardians raise five issues on appeal, all of which relate to the sufficiency of evidence and the trial court's interpretation of Utah Code Ann. §§ 78-3a-407 (1996) and -408 (Supp.1995). First, the guardians argue that there was sufficient evidence at trial showing that the mother's history of alcohol and drug abuse rendered her an unfit parent pursuant to § 78-3a-408(2)(c). Second, the guardians argue that the mother's history of violent behavior was of sufficient quantity and quality to render her an unfit parent under § 78-3a-408(2)(h). Third, the guardians contend that the December 1992 incident where the mother left K.S. unattended in the cab of a truck and the September 1994 beating of K.S. justify termination under § 78-3a-407(2) and/or require a finding of unfitness pursuant to § 78-3a-408(2)(b). Fourth, the guardians contend that the evidence regarding the mother's personality characteristics shows that she is unable to care for her children for extended periods of time and, accordingly, that she is an unfit parent under § 78-3a-408(2)(a). Finally, the guardians contend there was no evidence indicating that the mother's failure to provide her children with adequate food, clothing, shelter, and education was other than voluntary for purposes of § 78-3a-408(2)(d), making termination proper on "token efforts" grounds pursuant to § 78-3a-407(6). Although these issues appear to be factually based, and thus subject to review only for clear error, see In re S.T., 928 P.2d 393, 398 (Utah.Ct. App.1996), the parties conceded during oral argument that this case essentially boils down to the two legal issues stated in the text. We therefore focus our discussion on those issues.
[4] The statute allows the trial court to terminate parental rights if it finds that "only token efforts have been made by the parent ... to support or communicate with the child." Utah Code Ann. § 78-3a-407(6) (1996).
[5] At the times relevant, it is unclear whether the youngest child would have been able to understand a letter or to talk on the telephone.
[6] Subsection (2) of § 78-3a-408 was amended in I996. Essentially, the amendment established the former subsection (2)(i) as a circumstance constituting prima facie evidence of unfitness in new subsection (4). See Utah Code Ann. § 78-3a-408 (1996) (Amendment Notes).
[7] We recognize the trial court's finding regarding the number of social workers involved in the case who observed the mother rendering appropriate care to her children from time to time. The court specifically found that these social workers were more credible than the less objective witnesses who testified against the mother concerning her drug and alcohol abuse and her inability to render proper care to her children. The trial court's findings in this regard, however, deal solely with observations made by social workers prior to the abuse incident of September 1994. Significantly, the abuse occurred several months after the last observation was made by Mr. Gould, a DCFS child protection investigator, who observed in May 1994 that the mother was providing "appropriate care and environment" to her children. The fact that the abuse occurred in September 1994, some five months later, would appear to call into serious question the improvement in the mother's parenting ability perceived by the social workers.
[8] The remand we direct is not intended "`to be merely an exercise in bolstering and supporting the conclusion already reached.'... This court is not altogether confident that the trial court's final decision was correct...." Woodward v. Fazzio, 823 P.2d 474, 479 (Utah.Ct.App.1991) (quoting Allred v. Allred, 797 P.2d 1108, 1112 (Utah.Ct.App.1990)).